UNITED STATES of America
v.
Harry J. ALKER, Jr., Appellant.

No. 12313.

United States Court of Appeals Third Circuit.

Argued Jan. 23, 1958.

Decided Sept. 10, 1958.

Rehearing Denied Oct. 22, 1958.

See also 255 F.2d 851.

Raymond J. Bradley, Philadelphia, Pa. (Frank F. Truscott, Philadelphia, Pa., McBride, von Moschzisker & Bradley, Philadelphia, Pa., on the brief), for appellant.

John A. Erickson, Asst. U. S. Atty., Philadelphia, Pa. (Harold K. Wood, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, KALODNER, Circuit Judge, and WRIGHT, District Judge.

WRIGHT, District Judge.

The appellant, Harry J. Alker, Jr., an attorney, was convicted of willfully attempting to defeat and evade the income tax by filing a false and fraudulent return for each of the taxable years 1947, 1948, 1949 and 1950 pursuant to 26 U.S. C.A. § 145(b). The several years constituted separate counts in the indictment. Confinement for one year and a day and imposition of a $10,000 fine were decreed on each of the first three counts; the periods of imprisonment to run concurrently. On count four, appellant was sentenced to three years imprisonment to run consecutively with the sentence imposed on counts one, two and three. Execution on the fourth count was suspended and appellant was placed on probation for three years provided that within the first year bona fide efforts are made to conclude all matters involving tax liabilities between himself and the United States. This appeal followed.

The grounds urged for a new trial are set forth below:

1. The evidence was insufficient to support the verdict.

2. Defendant's motions for the withdrawal of a juror because of the improper cross-examination of one of his character witnesses should have been granted.

3. Defendant was prejudiced by the trial judge's failure to charge as requested.

4. Defendant was prejudiced by the trial judge's erroneous rulings on the admission of evidence;

(a) The trial judge erred in admitting the opinion testimony concerning the value of the Freihofer stock.

(b) The trial judge erred in admitting evidence concerning defendant's failure to file an income tax return for 1946, a year prior to the years covered by the indictment.

5. Defendant was deprived of a fair trial because of the denial of his motion for continuance.

The contentions will be considered seriatim.

## I

■ Section 145(b) of the 1939 Internal Revenue Code in pertinent part states:[1]

" * * * any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and upon conviction thereof be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

Proof that a taxpayer had net income greater than the amount disclosed in his return requiring the payment of a tax substantially in excess of that reported coupled with independent evidence that the understatement was willful is a violation of the denominated provision.[2]

■ The Government sought to sustain its burden of showing that appellant had net income greater than the amount reported by evidence of specific items of revenue purportedly received in the examination period. Appellant concedes, as he must, that the proof adduced would have enabled the triers to conclude that he had significantly understated his net income and correspondent tax liability for each of the indictment years.[3] The question presented is whether certain documents were sufficiently corroborated within the purview of Smith v. United States.[4] There the Supreme Court adopted for income tax prosecutions, the general rule that an accused cannot be convicted on his own uncorroborated confession. The opinion extended the doctrine to admissions at least where the statement is made after the fact to an official charged with investigating the possibility of wrongdoing, and the statement embraces an element vital to the Government's case.[5] Reference to the instant trial record is indicated to determine the exact application of the declared principles.

At the commencement of proceedings the Government introduced appellant's returns for 1947, 1948, 1949 and 1950 which disclosed the following data:[6]

Fig. 1

| Year | Net Income or (Loss) | Tax |
|------|------|------|
| 1947 | ($11,238.54) | None |
| 1948 | ($10,204.29) | None |
| 1949 | $14,975.77 | $3,643.11 |
| 1950 | ($27,512.02) | None |

The prosecution then proceeded to reconstruct appellant's true income for the period. Income from three principal sources was revealed: Professional fees; dividends and interest; directors' fees.

The dividend/interest figure was substantiated by testimony from representatives of the various corporations whose stocks and/or bonds were registered in the name of appellant. Cancelled checks were produced by these witnesses disclosing that the instruments were payable and endorsed by appellant.

The evidence concerning directors' fees consisted primarily of testimony by duly designated officials from the corporations

---

1. 26 U.S.C.A. § 145(b) (1939 Ed.).

2. United States v. Lindstrom, 3 Cir., 1955, 222 F.2d 761, certiorari denied 1955, 350 U.S. 841, 76 S.Ct. 81, 100 L.Ed. 750.

3. Appellant's brief at page 10 states:
 "If we assume for the moment that the prosecution's evidence was sufficiently corroborated, it would have enabled the jury to conclude that defendant had understated his net income and his tax liability for each of the years involved. From this evidence the jury could have decided that defendant had net income in addition to that declared in his returns of approximately $90,600 in 1947, $57,000 in 1948, $5,200 in 1949 and $188,700 in 1950." (N.T. 1593–99)

4. 1954, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192; see also United States v. Calderon, 1954, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202; Opper v. United States, 1954, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101.

5. Smith v. United States, 1954, 348 U.S. 147, 155, 75 S.Ct. 194, 99 L.Ed. 192.

6. Government's Exhibits G–1, 2, 3 and 4.

of which appellant was a director coupled with production of cancelled checks payable and endorsed by appellant. Entries transcribed from appellant's books established the remaining fees emanating from this source.

The largest item of unreported income involved earnings from appellant's thriving law practice. These sums were substantiated in part by direct testimony of clients which was documented where possible. In addition, transcriptions from appellant's books by revenue agents were submitted. Further, the Government relied on certain statements and schedules prepared by appellant or his accountant compiled for purposes of audit during administration of the Hurst and Freihofer estates. It is noted that the last mentioned documents were rendered by appellant in his capacity as executor of the estates. Finally, cancelled checks signed by appellant as executor of the Hurst and Freihofer estates which were submitted by him to Federal and State auditors of the estates were introduced.

From the previously noted evidence the Government summarized and presented what it deemed a fair representation of appellant's income for the crucial period. A qualified Revenue Agent prepared and submitted this resume to the triers.[7] In relevant part it disclosed the following:[8]

Fig. 2

NET INCOME

| Year | Reported | Corrected | Additional |
|---|---|---|---|
| 1947 | ($11,238.54) | $ 79,450.88 | $ 90,689.42 |
| 1948 | ($10,204.29) | $ 46,968.85 | $ 57,173.14 |
| 1949 | $14,975.77 | $ 20,171.37 | $ 5,195.60 |
| 1950 | ($27,512.02) | $161,224.77 | $188,736.79 |
| TOTALS | ($33,979.08) | $307,815.87 | $341,794.95 |

TAX LIABILITY

| Year | Reported | Corrected | Additional |
|---|---|---|---|
| 1947 | —0— | $ 46,131.71 | $ 46,131.71 |
| 1948 | —0— | $ 20,900.71 | $ 20,900.71 |
| 1949 | $3,643.11 | $ 5,888.57 | $ 2,245.46 |
| 1950 | —0— | $109,720.69 | $109,720.69 |
| TOTALS | $3,643.11 | $182,641.68 | $178,998.57 |

Appellant does not challenge the Government's proof elicited pertinent to the dividend, interest and director fee sources. The sole contention herein relevant is that certain documents introduced with respect to professional fees were admissions requiring corroboration which was lacking. Appellant urges that if the questioned exhibits be discarded the evidence is insufficient to sustain a finding that his net income was understated for 1947, 1948, 1949 and 1950.[9] The contested exhibits are Government's G–44, 71, 77, 78, 94, 95, 96, 97, 100 and 101. To properly delineate the issues

7. Turner v. United States, 4 Cir., 1955, 222 F.2d 926, 932, certiorari denied 1955, 350 U.S. 831, 76 S.Ct. 65, 100 L.Ed. 742.

8. Government Exhibits G–102, G–102–A.

9. In order to show no violation for 1950 certain evidence not encompassed by the contested documents, namely, receipt of William Freihofer stock would also have to be discarded. Consideration of this aspect is reserved for discussion under appellant's fourth assignment of error.

the contents of these documents will be briefly set forth:

Exhibit G–44 consists of 24 checks drawn on the estate of Winfred S. Hurst and payable to Harry J. Alker, Jr., (the drawer of the checks was Harry J. Alker, Jr., Executor of the estate of Winfred S. Hurst). The earliest of the 24 is dated January 20, 1950; the last October 12, 1950. They range in amount from $500 to $7,000 and total $90,206.49. The checks were submitted by appellant to the Internal Revenue Service in connection with the audit of estate tax return in the Hurst estate wherein the appellant was executor and attorney. Revenue Agent Gurbarg, who received the checks testified that defendant related they were in payment of a fee for services to the decedent during his lifetime, his executor's commission and his fee as attorney for the estate. These checks were furnished to substantiate particular deductions for debts and administration expenses claimed upon the estate tax return. G–44 was admitted without objection.

Exhibit G–71 comprises the original notes of testimony transcribed at a hearing on May 14, 1951 by Frank Rogers Donahue, Esq., the auditor of the estate of William Freihofer, pursuant to the direction of the Philadelphia Orphans' Court by whom the auditor was duly appointed. Harry J. Alker was both executor and counsel for the Freihofer estate. At the May 14 hearing Alker submitted in his official capacity, at the auditor's request, a list of expenses paid by him from the estate denominated attorney's fees. The statement was prepared from the records of the estate by Rhoads, appellant's accountant and bookkeeper. It disclosed numerous payments to Hall, Bruce & Alker, Attorneys, aggregating $92,100 for 1947, $32,600 for 1948 and $148,000 for 1949. Mr. Donahue personally testified and identified G–71.

With reference to the information set forth in the exhibit A. D. Bruce, Esq., testified that he was associated with Alker during the years 1947, 1948 and 1949 and that he received for his services

relating to the Freihofer estate $5,000 in 1947 and $10,000 in 1949. He identified exhibit D–3, a check dated July 19, 1949 for $10,000 which he stated represented the 1949 payment.

Edwin Hall, II Esq., testified he had been associated with Alker from 1947 through 1950, and that his fees from the Freihofer estate were $5,000 in 1947, $500 in 1948 and $30,000 in 1949.

G–77 is a statement of administrative expenses for the years 1947 and 1948 in the estate of William Freihofer voluntarily presented by Alker to auditors of the Internal Revenue Service. It lists certain legal fees paid to Alker as counsel and claimed by him in his executor capacity as deductions from the gross estate. The Revenue Service representatives were interested in the Freihofer estate tax return and the record is void of any evidence that they were investigating the subject matter of the present prosecution.

Accompanying G–77 was G–78 consisting of 8 cancelled checks drawn on the Freihofer estate and payable to Alker submitted by appellant to the Federal auditors of the estate to substantiate G–77.

G–94 and G–95 are transcripts prepared from appellant's fee ledger and cash book by agent Segal for the years 1947 and 1948. The transcriptions were made with appellant's consent in his law office. G–94 discloses that in 1947 Alker received fees of $97,122.44, and commissions of $4,928.84 totaling $102,051.28 less $3,585 paid to other attorneys. G–95 shows for 1948 total legal fees, directors' fees and commissions of $117,988.24, dividends of $2,181.68 and fees paid to other lawyers of $14,397.09.

G–96 is a list prepared by appellant's accountant, Rhoads, and submitted by defendant to former Revenue Agent, Mednick, during the course of the latter's investigation. The list purports to contain data concerning appellant's legal fees, directors' fees, commissions, rental income and payments made to other lawyers for 1949. It reflects total income of $239,457.22 and payments to

other lawyers of $101,490; among which there appears a payment of $6,000 to David Griffith.

G–97 is a schedule prepared by appellant's accountant, Rhoads, and submitted by appellant to former agent Mednick, during the course of the latter's investigation. The list purports to show defendant's legal fees and payments made to other lawyers for 1950. It indicates legal fees of $60,253.46 and payments to other lawyers of $11,811.25.

G–100 is a transcript of defendant's fee ledger prepared by former Revenue Agent Mednick, during the course of his investigation. It lists all fees and commissions in excess of $500 which had been entered in the fee ledger and some fees and commissions that were less than the stated amount. Also listed were payments to other lawyers appearing in the fee ledger. The transcript pertains to 1947 and 1948 and discloses total fees and commissions of $97,373.63 for 1947, less payments to other lawyers of $2,335 and total fees and commissions of $88,433.50 for 1948, less payments to other lawyers of $14,522.09.

G–101 consists of entries copied by agent Mednick from appellant's 1946 fee account which divulged fees received in January, 1947 of $3,000.

■ The court is unable to subscribe to appellant's view that all of the aforementioned documents are admissions and therefore subject to the strict legal rules pronounced by the Supreme Court.[10] The 24 cancelled checks comprising G–44 drawn on the estate of Winfred Hurst and payable to Harry J. Alker, Jr., totaling $90,206.49 represent the best evidence available in reconstructing appellant's 1950 income. Not even an appro-

priate assertion of privilege could have foreclosed their introduction into evidence.[11] Likewise, G–78 consisting of 8 cancelled checks drawn on the Freihofer estate and payable to Alker cannot properly be characterized as statements of the accused. To deny the triers access to these instruments unless independently substantiated could hardly be deemed more than a device calculated to impede the efficient administration of justice. The considerations enunciated by Mr. Justice Clark in support of the corroboration rule are manifestly inapplicable to G–44 and G–78.[12]

■ G–71 although unable to claim the sanctity accorded G–44 and G–78 is similarly not susceptible to appellant's characterization. The portion of the document particularly relevant is the schedule of fees and expenses incurred by the Freihofer estate during the course of its administration. The information submitted by Rhoads, appellant's accountant, was prepared from the records of the estate, a distinct entity.[13] The schedule was not limited to sums paid to appellant's law firm but included all expenditures within the denominated classification for the years 1932–1949.[14] Cancelled checks of the estate formed an essential source of Rhoads' report.[15] Against this background it would seem that the schedule restricted to payments during the indictment years is a form of direct evidence similar to the testimony elicited from the parade of Government witnesses concerning payments to the appellant.

The record is replete with materials tending to substantiate the accuracy of G–71. The schedules are directly traceable with minor exceptions into appel-

---

10. Note 4, supra.

11. United States v. Field, 2 Cir., 1951, 190 F.2d 554.

12. Smith v. United States, 1954, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192.

13. The record of proceedings held before Frank Rogers Donahue, Orphans' Court auditor of the Freihofer estate at page 1619 of the transcript discloses the following:

"Mr. Donahue: And this list is taken from the books of Mr. Alker or the estate?
"Mr. Rhoads: From the books of the estate."

14. G–71 p. 1618.

15. For purposes of foundation and clarification it would have been expedient to have summoned Rhoads.

lant's office bank statements and duplicate deposit slips.[16] In addition, all but two cancelled checks comprising G–78 are accounted for in G–71. The two not disclosed on the schedule appear on appellant's bank statement and duplicate deposit slips under appropriate date.

Exhibit G–77, a statement submitted by appellant to Federal auditors of the Freihofer estate, presumably prepared from the accounts of the estate, complements substantially the Orphans' Court report previously discussed. All items appearing therein with few exceptions, tie directly into appellant's bank statements and duplicate deposit slips. The accuracy of the transcription is further supported by the cancelled checks forming G–78.

█ With respect to the remaining enumerated documents there is perhaps merit to the contention that they should be considered statements of the accused whether they be technically denominated an admission or not. The Smith principle,[17] however, does not expose all statements of an accused to corroboration. The Supreme Court precisely stated: "We hold the rule applicable to such statements, at least where, as in this case, the admission is made after the fact to an official charged with investigating the possibility of wrongdoing, and the statement embraces an element vital to the Government's case." [18] The quoted passage clearly attempted to confine the rule to the immediate facts. It was neither intended to require all "admissions" submit to the test nor to exclude from the doctrine statements made before the fact to a party in a nonofficial capacity. For example it would be manifestly unfair to permit unverified financial statements submitted at the request of a merchant for credit purposes to sustain independently the burden of tax understatement. On the other hand,

footnote 3 of the Opinion recognizes that admissions under special circumstances, providing grounds for a strong inference of reliability may not have to be corroborated.[19] Thus, it is the policy the rule serves, that is paramount in deciding the need for corroboration.

There is no constraint in the instant case, however, to determine whether the remaining contested documents G–94, 95, 96, 97, 100 and 101 are admissions necessitating corroboration. For as will presently be demonstrated, the record is replete with the requisite independent substantiation.

The standard pronounced in Smith may be met either by independently establishing the crime, or corroborating the admission. At page 157 of 348 U.S., at page 199 of 75 S.Ct. Mr. Justice Clark states: [20]

"Under the above standard the Government may provide the necessary corroboration by introducing substantial evidence, apart from petitioner's admissions, tending to show that petitioner willfully understated his taxable income. This may be accomplished by substantiating the opening net worth directly, * * *.

"But substantiating the opening net worth is just one method of corroborating these extrajudicial statements. Petitioner's admissions may also be corroborated by an entirely different line of proof—by independent evidence concerning petitioner's conduct during the prosecution period, which tends to establish the crime of tax evasion without resort to the net worth computations. * * * *"

In the present prosecution the extrinsic evidence was sufficient to meet both measures.

16. G–52 to G–56, inclusive.

17. Note 4, supra.

18. 1954, 348 U.S. 147, 155, 75 S.Ct. 194, 198, 99 L.Ed. 192.

19. 1954, 348 U.S. 147, 155, 75 S.Ct. 194, 99 L.Ed. 192.

20. 1954, 348 U.S. 147, 157–158, 75 S.Ct. 194, 99 L.Ed. 192. It would seem that corroboration by independent substantiation of the charge is an illusory concept for if the crime be extrinsically established, there is no need for corroboration except perhaps as cumulative evidence.

The majority of the sixty witnesses called by the Government testified to specific payments made to appellant either for legal services, dividends, interest or directors' fees. Cancelled checks were produced to substantiate their testimony. From the record and stipulation of counsel, the general purport of this testimony pertinent to professional fees is set forth:

Witness Michie, a partner in the firm of Andrew Y. Michie & Sons of Philadelphia stated that Harry J. Alker, Jr., as counsel for the firm received $500 in 1947, $1,000 in 1948 and $2,000 in 1949.

Witness Culleton, an accountant employed by Chandler Laboratories, Inc. testified that the company in 1947 paid Harry J. Alker, Jr., $559.05 for legal services.

Witness Frazier, the secretary and assistant treasurer of Phillips & Jacobs, Inc. testified that Harry J. Alker, Jr., as company's counsel received $3,500 in 1947, $2,000 in 1948, $2,500 in 1949 and $2,500 in 1950.

Witness Geuther, an attorney, stated that he and Alker were counsel for the executors of the Peiffer Estate and that in 1949 a check for $2,500 was issued by the executors as attorney's fees. The witness endorsed the check to Alker and received his check for $1,250.

Witness Palermo, co-executor of the Griffith Estate, testified that Alker was paid $25,000 (1948—$9,500; 1949—$6,500; 1950—$9,000) for services performed on behalf of the estate. The cancelled checks supporting the payments were marked Exhibit G–11.

Witness Lohmar, the comptroller of Mrs. Smith's Pie Co. stated that Alker was counsel for the company. In 1949 and 1950 he was paid counsel fees of $2,000 and $2,800 respectively.

Witness Guth, an attorney, stated that in 1949 a fee of $6,000 was paid to Alker, who in turn issued checks totaling $5,000 to the witness and another attorney as their share of the fee.

Witness Hartnett, secretary-treasurer of Penn Paper & Stock Co. testified that Alker had been paid counsel fees of $5,000 in 1947, $5,000 in 1948, $1,000 in 1949 and $6,000 in 1950.

Witness Andriuzze, treasurer of Linen Thread Co. stated that Alker had been paid $500 in counsel fees for each year covered by the indictment.

Witness Ward, an attorney administering the estate of Lemuel B. Schofield, Esq., disclosed that the decedent had paid appellant $3,650 in 1947 as his share of a legal fee in connection with settling the Neville Estate and the Daniel Murphy Trust.

Witness Branin, a trust officer of the Girard Trust Corn Exchange Bank, testified that the bank was fiduciary for the Reeves and Bunting Estates which records divulged payments for legal fees to Alker of $500 in 1948, $500 in 1949 and $2,000 in 1950.

Witness Reissinger, treasurer of Paper Corporation of United States, testified Alker received $750 in 1949 for legal services.

Witness Wilkinson, a record's clerk employed by Tradesmens Bank & Trust Co. of Philadelphia, testified that Alker was paid $5,000 in legal fees in 1948.

Witness MacDonnell, first assistant clerk of the Philadelphia Orphans' Court, stated that the records of various estates disclosed attorney's fees received by Alker of $1,106.50 in 1947, and $4,443.50 in 1948.

Witness Dorch, secretary-treasurer of Freihofer Baking Co. testified to the following payments made to Alker for legal services: 1947—$1,100.15; 1948—$2,500; 1949—$2,500.

Witness Sarah Freihofer, testified she sent appellant a certificate for 2,000 shares of William Freihofer stock in December, 1950 with the understanding that appellant was to transfer to himself 200 shares as payment for legal services. On one occasion on cross-examination, witness Freihofer stated that the posting of the certificate might have been in January, 1951 instead of December, 1950.[21]

21. N.T. pp. 183–196.

Witness Lucy M. Hurley, testified that she was a companion of Mrs. Freihofer and that under the direction of Mrs. Freihofer she sent by registered mail a stock certificate representing ownership of 2,000 shares of William Freihofer stock to appellant's law office in December, 1950.[22]

Appellant's letter of February 12, 1952 to Agent Mednick recites that 50 shares of the questioned Freihofer stock were received in 1948, 100 shares in 1949, and 50 shares in 1950.[23]

■ A guilty verdict having been returned, the Government is entitled to the inference that the jury found beyond a reasonable doubt the stock was received in the indictment period.[24] The Government alleged a $510 per share value;[25] appellant contends the value at receipt date was $200.[26]

A tabulation of the amounts indicated by the direct testimony coupled with receipts from the Freihofer and Hurst estates as set forth in G–44, G–71, G–77, G–78, and the dividends, interest and directors' fees shown on the Government's resume G–102, which sums appellant concedes were founded upon substantial evidence, discloses:

Fig. 3.

| Source | 1947 | 1948 | 1949 | 1950 |
|---|---|---|---|---|
| Witness testimony Legal fees | $ 15,915.70 | $30,443.50 | $ 26,750.00 | $124,800.00 |
| Freihofer Estate G-71, 77, 78 | 91,600.00 | 50,083.55 | 148,000.00 | |
| Hurst Estate G-44 | | | | 90,206.49 |
| Total from Profession | $107,515.70 | $80,527.05 | $174,750.00 | $215,006.49 |
| Dividends G-102 | 2,523.60 | 8,257.55 | 10,466.40 | 20,186.75 |
| Directors' fees G-102 | 605.00 | 675.00 | 750.00 | 615.00 |
| | $110,644.30 | $89,459.60 | $185,966.40 | $235,808.24 |

Comparing the professional fees set forth in the preceding chart with the gross receipts from profession listed in appellant's returns, reveals in each instance substantial nonreporting and understatement:

Fig. 4.

| | 1947 | 1948 | 1949 | 1950 |
|---|---|---|---|---|
| Figure 3 | $107,515.70 | $80,527.05 | $174,750.00 | $215,006.49 |
| Per appellant's returns G-1, G-2, G-3, G-4 | 68,307.79 | 66,808.45 | 137,967.22 | 53,103.63* |
| Difference | $ 39,207.91 | $13,718.60 | $ 36,782.78 | $161,902.86 |

22. N.T. pp. 200–204.

23. N.T. pp. 839, 1336.

24. Hoyer v. United States, 8 Cir., 1955, 223 F.2d 134, 139.

25. N.T. 769–770.

26. N.T. 1337–1340.

* Includes $4,661.42 listed by appellant as commissions and directors' fees.

Since appellant has challenged the competency of the Government's case solely with respect to receipts from appellant's profession, and there being no material dispute pertinent to deductions and exemptions claimed, these charts illustrating in summary form data which the court deems admissible without corroboration and the comparisons and conclusions drawn therefrom are particularly significant in view of the narrow issue under consideration.[27]

In neither appellant's 1947 nor 1948 return was any sum styled dividends or interest reported. For 1949 and 1950 appellant included in his return as dividends $3,005.50 and $8,143.25 respectively, in both instances the amounts were significantly less than the proof adduced. The evidence thus portrayed renders appellant's contention untenable and, accordingly, demonstrates that the Government has shouldered the burden of understatement.

■ In addition to the foregoing, the second standard pronounced in Smith v. Commission is similarly met.[28] Specifically there was sufficient independent evidence to corroborate contested documents G-94, 95, 96, 97, 100 and 101.

G-94, 95, 100 and 101 as noted were transcripts of appellant's books and records prepared by Revenue Agents. The individual entries to a large extent are traceable into appellant's bank statements and duplicate deposit slips.[29] Further, exhibits G-71, 77 and 78, and the testimony elicited from the Government's witnesses are directly referable to the transcripts. Considering the nature of the documents and their inherent degree of reliability, together with the denoted substantiation, can but lead to the singular conclusion that corroboration was present.

G-96 and G-97 having been prepared by appellant's accountant during the course of investigation are unquestionably representative of the class of documents termed suspect by the Supreme Court not only from the standpoint of the accused but also from the Government's position.[30] They have been, however, sufficiently corroborated to this court's satisfaction to be rendered competent. Cancelled checks, produced by the appellant, account for all but $566.25 of $11,811.25 listed on schedule G-97 as fees paid to others. With this degree of substantiation established, the Government.

---

27. To complete the picture, appellant's taxable income for the subject years computed by subtracting deductions and exemptions shown on appellant's returns from the totals listed in Figure 3 would be:

| | 1947 | 1948 | 1949 | 1950 |
|---|---|---|---|---|
| Total Receipts Fig. 3 | $110,644.30 | $89,459.60 | $185,966.40 | $235,808.24 |
| Less deductions per appellant's returns | 79,546.33 | 77,012.74 | 128,618.60 | 92,336.76 |
| Net Income | $ 31,097.97 | $12,446.86 | $ 57,347.80 | $143,471.48 |
| Less exemptions per returns | 1,500.00 | 1,200.00 | 1,200.00 | 1.200.00 |
| TAXABLE INCOME | $ 29,597.97 | $11,246.86 | $ 56,147.80 | $142,271.48 |

Appellant's returns for the same period disclose:

| | 1947 | 1948 | 1949 | 1950 |
|---|---|---|---|---|
| Net Income or (Loss) | ($11,238.54) | ($10,204.29) | $14,975.77 | ($27,512.02) |
| Less exemptions | | | 1,200.00 | |
| TAXABLE INCOME | | | $13,775.77 | |

28. Note 20 supra.

29. G-52 to G-56, inclusive.

30. Smith v. United States, 1954, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192.

although not bound to accept the amounts denoted as fees, should be able to employ those portions of the document it desires. Additional verification pertinent to the fee aspect was accorded by direct testimony. G–96 covering fees and payouts for 1948 was subjected to similar tests and was found to be sufficiently reliable for purposes of jury consideration.

■ Thus evaluated the court concludes that the evidence adduced under any standard was competent to sustain a finding of substantial understatement.

■ Appellant next urges that the element of willfulness was not present. The court is keenly aware of the judicial construction requiring its independent existence [31] which may be proved as other factual questions by direct or circumstantial evidence.[32] The requisite proof may take a wider range than is normally allowed in support of annexed issues, otherwise, there would often be no means to disclose the purpose of the act in which the very gist of the offense may consist.[33] Mere understatement of

tax liability, however, is insufficient to sustain the burden.[34] The instant record is replete with independent substantiation of the charge.

■ Properly before the triers were the following factors which have been decisionally cited as evidencing the proscribed conduct. First, the record discloses that the appellant was an attorney specializing in estate and tax matters. The jury was therefore entitled to infer that an astute practitioner learned in the area of taxation is required to file returns fairly reporting income, subject to taxation.[35] Second, although mere understatement of tax liability cannot substantiate the charge, consistent understatement is evidence of willfulness.[36] Third, appellant's nonreporting of dividends or interest in 1947 and 1948 was a factor to be considered by the jury in view of the professional attainments of appellant.[37] Fourth, the belated filing of returns is a determinant, especially where the appellant knows an investigation of his tax liability for prior years has commenced and other acts of conceal-

31. Holland v. United States, 1954, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150; Blackwell v. United States, 8 Cir., 1957, 244 F.2d 423, 429.

32. Hoyer v. United States, 8 Cir., 1955, 223 F.2d 134, 139.

33. Note 32, supra.

34. Holland v. United States, 1954, 348 U.S. 121, 129, 75 S.Ct. 127, 99 L.Ed. 150; Blackwell v. United States, 8 Cir., 1957, 244 F.2d 423, 429.

35. United States v. Cirillo, 3 Cir., 1957, 251 F.2d 638, certiorari denied 1958, 356 U.S. 949, 78 S.Ct. 914, 2 L.Ed.2d 843; 26 U.S.C.A. (I.R.C.1939) § 145(a), and 26 U.S.C.A. (I.R.C.1954) § 7203 Prosecutions; Fischer v. United States, 10 Cir., 1954, 212 F.2d 441; Gaunt v. United States, 1 Cir., 1950, 184 F.2d 284, at page 290 recognizes that the attainments of an accused are a proper consideration on the issue of willfulness:

"* * * His understatements of income must be viewed in their setting, and so viewed we are convinced that the jury could well find that the understatements were wilful, for if the jury accepted the Government's evidence, as it was entitled to do, it could well have found that the defendant was an intelligent, astute and

successful business executive with many years of experience who had full records of his income available, and that the understatements in his returns for the years involved, which he made out himself, were gross. Under these circumstances it seems to us clear that the jury could very reasonably have inferred that beyond a reasonable doubt the defendant's understatements of income were made wilfully in an attempt to evade or defeat taxes, and wholly discounted his defense that those understatements for the most part were made stupidly or carelessly. * * *"

36. Holland v. United States, 1954, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150; Smith v. United States, 1954, 348 U.S. 147, 157, 75 S.Ct. 194, 99 L.Ed. 192; Blackwell v. United States, 8 Cir., 1957, 244 F.2d 423, 429.

"There was a sufficient showing of intent. The prosecution showed understatement of income for several other years specifically for the declared purpose of showing intent. This is itself enough." United States v. Frank, 3 Cir., 1957, 245 F.2d 284, 287, certiorari denied 1957, 355 U.S. 819, 78 S.Ct. 25, 2 L.Ed. 2d 35.

37. Hoyer v. United States, 8 Cir., 1955, 223 F.2d 134, 139–140.

ment have been demonstrated.[38] Fifth, evidence that appellant did not file a return for 1946 when, in fact, he declared in his 1947 return he had so filed, under the present circumstances was suitable to indicate willful conduct.[39]

In view of the foregoing appellant's contention is deemed meritless.

## II

Appellant's second assignment of error involves the permissive bounds of cross-examination applicable to a character witness. The examination complained of is set forth below:[40]

"* * * William J. Hamilton, Jr., a member of the Board of Revision of Taxes of Philadelphia, * * *.

"(a) 'Q. Now, you have told us that you know him and know other people who know him as a good character, as a law-abiding citizen. Have you heard that he was under indictment in what is known as the Hurst estate? A. No. No.'

"(b) 'Q. Mr. Hamilton, have you heard that the defendant, Mr. Alker, is awaiting a hearing on disbarment proceedings in Norristown, Montgomery County? A. No.'

"(c) 'Q. * * * Have you heard that Mr. Alker's right to practice with a Treasury Card before the Revenue Service has been withdrawn? A. No.' "

Counsel for appellant timely objected to each of these questions and moved for the withdrawal of a juror. The trial court overruled the motion and objection but cautioned the jury as follows: "I say to you that regardless of the answers of the witness or witnesses you are not to assume that the incident asked about actually took place. All that is happening is that the witnesses' standard of opinion of the reputation of the defendant is being tested.[41]

Both appellant and appellee rely on Michelson v. United States [42] in support of their respective positions. There the Supreme Court held the scope of permissive cross-examination of character witnesses is a matter peculiarly reserved for the sound judgment of the trial judge to be reviewed solely for prejudicial abuse of discretion.

"* * * Both propriety and abuse of hearsay reputation testimony, on both sides, depend on numerous and subtle considerations, difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject.

"Wide discretion is accompanied by heavy responsibility on trial courts to protect the practice from any misuse." [43]

Mr. Justice Jackson's commentary is therefore deemed as setting forth certain standards that an appellate court may consider in review. They should neither be termed minimum nor maxi-

---

**38.** Appellant's returns for 1949 and 1950 were filed February 28, 1952 (G–3) and February 29, 1952 (G–4) respectively, long after the statutory dates for reporting. (Filing dates required by the 1939 Code, 26 U.S.C.A. § 53(a): 1949–March 15, 1950; 1950–March 15, 1951). No extension of time for filing was requested nor was any granted.

Revenue Agent Segal apprised appellant that his 1947 and 1948 returns were under investigation on May 3, 1950 (N.T. 658).

**39.** See court's discussion under assignment of error, IV.

**40.** Appellant's brief at page 16. A perusal of the appropriate portions of the notes of testimony discloses that appellant's attribution of a "no" answer to the question, "Mr. Hamilton, have you heard that the defendant, Mr. Alker, is awaiting a hearing on disbarment proceedings in Norristown, Montgomery County?" is incorrect. The record reveals that this particular inquiry was inadvertently not answered. (N.T. 1573–1579).

**41.** N.T. 1578–1579.

**42.** 1948, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168.

**43.** 1948, 335 U.S. 469, 480, 69 S.Ct. 213, 221, 93 L.Ed. 168.

mum measures; the peculiar factual situation presented should govern. Appellant's brief lists four of the indicia announced, a fifth is added by the court:

1. The trial court should ascertain out of the presence of the jury that the target of the question was an actual event which would probably result in some comment among acquaintances, if not injury to defendant's reputation.[44]

2. The inquiry must be in approved form. "Have you heard" is correct, whereas, "Do you know" is improper.[45]

3. The event inquired about must show a defect of character similar to that which defendant's witnesses said he was reputed not to exhibit.[46]

4. The jury must be instructed concerning the limited purpose of the inquiry.[47]

5. The question may not be hypothetical nor assume unproven facts and ask if they would affect the conclusion.[48]

■■■ The interrogation under consideration exceeded the bounds of propriety. One question not specifically assigned as error but covered by counsel's trial objection was in hypothetical form manifestly violative of the decisional law.[49] Immediately after witness Hamilton denied any knowledge of the Hurst estate indictment he was asked: "If you had heard that, would it modify your judgment some as to his law-abiding citizenship?" Hamilton replied, "No."[50]

To permit inquiries of this nature would undermine the cautioning instruction sanctioned by Michelson[51] and adopted by the trial judge in the immediate prosecution to the effect that the triers are not to assume the occurrence of the disreputed act.[52] In addition, serious doubt is raised as to the currency and similarity of character defects with respect to the disbarment and treasury card incidents.[53]

■■■ As previously observed, however, an appropriate cautionary instruction was accorded.[54] Moreover, the examination was in approved form. Further, there was sufficient basis for the lower court's implicit finding that the subject events had actually occurred.[55] In areas of discretion an appellate court should not substitute its deliberative conclusions for those of the trial judge made under the most unfavorable circumstances during the course of a heated trial unless the determination is completely void of substantiation. An essential component of the discretion concept as employed in this context is the setting under which it is exercised.

Having found, however, some trace of impropriety the issue is whether it is,

---

44. Id., 335 U.S. at page 481, 69 S.Ct. at page 221.

45. Id., 335 U.S. at page 482, 69 S.Ct. at page 221.

46. Id., 335 U.S. at pages 483–484, 69 S.Ct. at page 222.

47. Id., 335 U.S. at page 485, 69 S.Ct. at page 223.

48. Id., 335 U.S. at page 480, footnote 17, 69 S.Ct. at page 221.

49. Little v. United States, 8 Cir., 1937, 93 F.2d 401.

50. The precise examination herein pertinent is as follows:
 Witness Hamilton:
 "Q. * * * Have you heard that he was under indictment in what is known as the Hurst Estate? A. No. No.
 "Q. If you had heard that, would it modify your judgment some as to his law-abiding citizenship? A. No.

"Mr. Fogwell: Could we see your honor at side bar for just a minute?
 "The court: Surely. (Discussion at side bar, out of the hearing of the jury as follows:)
 "Mr. McBride: I want to move for the withdrawal of a juror and the declaration of a mistrial because of the question that was asked of this last witness.
 "The Court: Overruled." (N.T. 1573–1574.)

51. 1948, 335 U.S. 469, 472–473, 69 S.Ct. 213, 93 L.Ed. 168.

52. Note 41, supra.

53. Myres v. United States, 8 Cir., 1949, 174 F.2d 329, 338.

54. Note 41, supra.

55. With respect to the status of a disbarment action as a judicial proceeding, see Doe v. Rosenberry, 2 Cir., 1958, 255 F.2d 118.

·of sufficient magnitude to warrant reversal. The teaching of Michelson specifically provides that lower court rulings should only be disturbed on clear showing of prejudicial abuse of discretion.[56] The harmless error doctrine enunciated in Kotteakos v. United States is to the same effect.[57] Reference to the trial proceeding is therefore indicated.

Hamilton's testimony comprised merely seven pages of the record totaling approximately 1700 pages. Seven witnesses, including Hamilton, vouched for appellant's reputation "as a law-abiding citizen." The favorable testimony of eleven other members of the community was stipulated; the persons when called stated their name and address then withdrew. Hamilton was the sole witness interrogated concerning the discredited acts. The government in rebuttal summoned two witnesses who stated that appellant's character trait for honesty and integrity was "not good."[58]

Of the three alleged incidents it would be difficult to conceive of any having a more telling effect than the Hurst event. This was the only real imputation of illegal conduct. Except for the hypothetical question following the initial inquiry whether witness Hamilton had heard of appellant's indictment, the examination respecting this matter was in every manner proper. In fact, appellant essentially concedes this to be the case.[59]

The trial consumed twenty-one days encompassing four months. The record indicates that the substantive proof over-

---

56. Note 43, supra.

57. Kotteakos v. United States, 1946, 328 U.S. 750, 762, 764–765, 66 S.Ct. 1239, 1246, 90 L.Ed. 1557.

"In the final analysis judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of *stare decisis* by what has been done in similar situations. * * * Necessarily the character of the proceeding, what is at stake upon its outcome, and the relation ·of the error asserted to casting the balance for decision on the case as a whole, are material factors in judgment.

\* \* \* \* \*

" * * * It is guilt in law, established by the judgment of laymen. And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. * * *

\* \* \* \* \*

"If, when all is said and done, the ·conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm ·or a specific command of Congress. Citing cases. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous .action from the whole, that the judgment ¬was not substantially swayed by the ·error, it is impossible to conclude that ·substantial rights were not affected.

The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

See also Federal Rules of Criminal Procedure 52(a), 18 U.S.C.A.

58. N.T. 1618–1624.

59. Appellant's brief at page 27, f.n.5 states:

"The prosecution's question about defendant's indictment in the Hurst estate stands on somewhat better footing than do the questions we have so far discussed. The defendant was under indictment in the District Court for the Eastern District of Pennsylvania in connection with the Hurst estate (Criminal Nos. 18,730 and 18,731). In the record there is a statement by counsel for defendant that indictment was 'an income tax indictment' (N.T. 1574); in fact the indictment charged an attempt to evade the estate tax and conspiracy. Thus, that question did involve an actual event and one which might result in comment about defendant. But the question as put by the prosecution revealed nothing regarding the offense with which defendant was charged; hence the question would appear to be improper under the Gaunt case, supra. However, even if this question was proper, defendant was no less prejudiced by the other two questions."

For the history and disposition of the Hurst estate see United States v. Alker, 3 Cir., 1958, 255 F.2d 851.

whelmingly pointed toward guilt. In fact, the evidence was so strong no jury could have acquitted.

It is important to note that the visiting trial judge had inexhaustible patience, counsel representing appellant and appellee eminently seasoned in litigation techniques were continually taxing the full mental and physical capacities of the court. Under these circumstances it is remarkable that the record should be so devoid of alleged improprieties to accord appellant only five averments of error.

In accordance with the foregoing the court is unable to conclude that the cross-examination of witness, Hamilton, was prejudicial under Michelson, [60] nor did it have substantial influence upon the verdict within the purview of Kotteakos.[61]

■ One final observation is deemed appropriate. The reference in Michelson to the heavy responsibility conferred on the trial court in administering receipt of character testimony seems somewhat restrictive.[62] A burden of equal accountability must be placed upon the practitioner. It is simply not realistic to exact high standards from the trial judge alone when he is called upon to make prompt decisions during the course of a bitterly contested criminal trial. A conference in chambers or at side bar prior to embarking on this phase of the proceeding, where the issues are tried to a jury, perhaps is one workable solution. At this meeting opposing counsel would be expected to discuss candidly all pertinent factors. If counsel feel examination will be restricted by exchange of this information then it is their duty to forward the relevant data to the judge by memoranda. There can be no valid reason, however, in a jury case foreclosing to the judge prior to witness examination access to this knowledge. Moreover, it is incumbent on counsel to take the initiative for they are closer to the realities and exigencies of the situation.

### III

Appellant's third averment of error is that the trial court erred in refusing to adopt appellant's points for charge Nos. 13 and 20.

Requested instruction 20 was addressed to the element of willfulness. Appellant urges that the court's charge was legally vulnerable because it failed to enunciate specifically the evidence required to sustain a jury determination. Point for charge 20 stated: [63]

"20. Wilfulness is an element of the offense charged in this case separate and apart from the element of understatement of net income. Wilfulness involves a specific intent which must be proved by the prosecution beyond a reasonable doubt by independent evidence. You may not infer wilfulness merely because you find a substantial understatement of net income."

■ It is elementary that the trial judge is never bound to instruct a jury in the exact language requested.[64] In the instant proceedings, the court concludes that the trial judge's charge, excerpts of which are set forth below, conforms to the judicial pronouncements and substantially encompassed appellant's point for charge 20.

60. Note 43, supra; see also Little v. United States, 8 Cir., 1937, 93 F.2d 401, 408; Reuben v. United States, 7 Cir., 1936, 86 F.2d 464, 468.

61. Note 57, supra; see also Snead v. United States, 4 Cir., 1954, 217 F.2d 912; Saunders v. United States, 1951, 89 U.S. App.D.C. 291, 192 F.2d 409; United States v. Broxmeyer, 2 Cir., 1951, 192 F.2d 230; Campbell v. United States, 1949, 85 U.S.App.D.C. 133, 176 F.2d 45,

47; Clainos v. United States, 1947, 82 U.S.App.D.C. 278, 163 F.2d 593; Knuz v. United States, 5 Cir., 1951, 188 F.2d 9; 3 Villianova Law Rev. 48 (1957).

62. Note 43 supra.

63. Appellant's brief, p. 28.

64. United States v. Smith, 3 Cir., 1953, 206 F.2d 905, 911; Mannix v. United States, 4 Cir., 1944, 140 F.2d 250.

"* * * To prove this offense, the prosecution must establish two basic propositions, and it is incumbent upon the prosecution to prove each of these propositions by evidence which convinces you beyond a reasonable doubt. First, the prosecution must prove beyond a reasonable doubt that for each of the years the defendant had a net income in excess of the amount shown in his return which required the payment of an income substantially in excess of that shown in his return. In addition, the prosecution must prove beyond a reasonable doubt that in signing and filing his return for each year, the defendant did so in an attempt willfully and knowingly to evade the tax due and owing by him.[65]

\* \* \* \* \* \*

"* * * As to each count, the government must prove beyond a reasonable doubt that the defendant had knowledge and understanding that during the calendar year involved (that is, 1947, 1948, 1950, respectively) he had income which was taxable and which he was required by law to report, and that he attempted to evade and defeat the tax thereon, or a portion thereof, by willfully filing a false and fraudulent income tax return for each year, wherein he purposely failed to report all the net income which he knew he had received during the year involved and which he knew it was his duty to state and include in his return for such year. \* \*[66]

\* \* \* \* \* \*

"Willfulness is an essential element of the crime proscribed by the law herein involved. It is best defined as a state of mind of the taxpayer wherein he is fully aware of the existence of a tax obligation to the government which he seeks to conceal. A willful evasion of the tax requires an intention act or omission as compared to an accidental or inadvertent one. It also requires a specific wrongful intent to conceal an obligation known to exist, as compared to a general misunderstanding of what the law requires or a bona fide belief that certain receipts are not taxable." [67]

"Even if you are convinced beyond a reasonable doubt that the defendant owed an income tax in any year substantially in excess of that shown by his return, you must find him not guilty of the offense charged for that year unless you are also convinced beyond a reasonable doubt that at the time he signed and filed the return he did so in an attempt willfully and knowingly to defeat or evade the income tax due and owing by him.

"If you find that the defendant entrusted the keeping of his financial records to employees to whom he made available all the data necessary for the preparation of his returns for each of the years involved, that these employees prepared each of the returns, and that the defendant relied in good faith upon their calculations and believed that each of the returns correctly showed his net income and the amount of tax due, then you must find the defendant not guilty, even though you find that all or some of the returns were incorrect and the defendant owed a tax for any year substantially in excess of that shown to be due on the return.

"If you are convinced beyond a reasonable doubt that some item or items of income should have been reported by the defendant in his return for a particular year and were not so reported, you must also be convinced beyond a reasonable doubt that this was done willfully. In deciding whether or not it was done

---

65. N.T. 1692–1693.

66. N.T. 1693.

67. N.T. 1694; United States v. Martell, 3 Cir., 1952, 199 F.2d 670, 672.

willfully, you may take into consideration, along with all the other evidence, that the defendant reported the item or items in a return for a subsequent year, and if this raises a reasonable doubt about his willfulness, you must resolve that doubt in his favor.[68]

\* \* \* \* \* \*

"If you find that the defendant acted in good faith in valuing the stock of the Freihofer Baking Company received from Mrs. Freihofer or that he relied in good faith upon the value placed thereon by the employees who kept his records, you may not conclude that he acted willfully with respect thereto, even though you find that the value of that stock was substantially in excess of the value arrived at by the defendant or his employees." [69]

■ Appellant's point for charge 13 was directed toward proper allocation of a fee received for legal services from Mrs. Sarah Freihofer consisting of 200 shares of William Freihofer Company

stock. There was some conflict in the testimony concerning the year it was received by appellant.[70] Requested point 13 provided:[71]

"13. The prosecution has the burden of convincing you that the fee paid to the defendant by Mrs. Freihofer was received in a particular year. If, after considering all the evidence, you are in doubt concerning the year in which the fee was paid, you may not consider it in determining defendant's income for any of the years in question."

Failure to instruct the triers with respect to the negative aspects of the Freihofer stock, namely, if the jury were in doubt as to the year the fee was paid, it may not be considered in any year is the thrust of appellant's allegation. The court holds the trial judge's instruction noted in the margin[72] articulated the requisite rules to properly handle the questioned item of income and that further specification was unnecessary.

---

68. N.T. 1708–1709.

69. N.T. 1710.

70. Notes 21–23, supra.

71. Appellant's brief, p. 31.

72. "Certain of the evidence deals with the fee paid to the defendant by Mrs. Sarah Freihofer for legal services rendered to her over a period of many years. The fee was composed of 200 shares of stock of the Freihofer Baking Company. One of the questions with respect to this fee is the year in which it was received by the defendant. It is up to you to resolve any conflicts in the evidence concerning the time of receipt. If you find that it was received partly in 1948, partly in 1949 and partly in 1950, you must include an appropriate part of the value of the stock in the defendant's income for each of those years. If you find that it was received in 1950, you must include the value of the stock in his income for that year. If you find that it was not received by the defendant until 1951, then for the purposes of this case you must disregard the fee entirely.

"The government has the burden of proving to you beyond a reasonable doubt that the fee paid to the defendant by Mrs. Freihofer was received by the defendant in a particular year, or in specific years involved herein, before you may consider the same as reportable income for such year or years by the defendant. \* \*" (N.T. 1703–1704.)
"First the prosecution must prove beyond a reasonable doubt that for each of the years the defendant had a net income in excess of the amount shown in his return. \* \* \*" (N.T. 1692.)
"With respect to any of these years you must be convinced beyond a reasonable doubt that the defendant did not have any loss but instead had a substantial amount of net income. \* \* \*" (N.T. 1693).
"The evidence in this case discloses that Mr. Alker's income tax returns involved herein were prepared under the cash method or on a cash basis, that is, on the basis of actual receipts and disbursements. Under this method of making returns, only income collected each year is taxable." (N.T. 1715.)
See also Note 66, supra; note 68, supra, last paragraph of the text.

■ Notwithstanding the conclusion that the charge permitted proper allocation of the Freihofer fee, appellant's statement allegedly drawn from the Holland case,[73] that "unless the jury could allocate this fee to a particular tax year, it could not consider it at all, otherwise defendant might be convicted on counts of which he was innocent"[74] is not entirely accurate. In United States v. Calderon decided the same day as Holland, the Supreme Court held that for corroborative purposes an item of income need not be assignable to a particular indictment year so long as it indicates a substantial deficiency for the overall prosecution period.[75] Thus for this additional reason appellant's position is untenable.

## IV

The fourth assignment of error questions rulings of the trial judge relating to the admissibility of certain evidence. Appellant initially urges that opinion testimony offered by Government witness Greenstein, concerning the value of 200 shares of William Freihofer Company stock transferred to appellant by Mrs. Sarah Freihofer in payment for services was an uninformed guess and hence improperly received into evidence.

■ The admissibility of expert testimony is a matter peculiarly within the sound discretion of the trial judge.[76] In exercising this function the trial judge must consider three factors:[77]

■ 1. The nature of the subject matter and whether it is such that the issues cannot be properly understood or determined without the aid of opinions of persons of special knowledge or experience.

■ 2. The credentials of the person offering to testify as an expert in order to determine whether he possesses the requisite qualifications and the degree of expertise to accord an informed opinion.

■ 3. The proposed expert's acquaintance with the basic facts necessary to form an intelligent opinion.

Appellant's sole contention is that witness Greenstein was not sufficiently acquainted with the facts to evaluate the worth of the stock at $510 per share. Failure of witness Greenstein to apply revenue regulation 105, § 81.10 in arriving at his determination is the basis of the averment. Section 4 of the aforementioned ruling provides:[78]

"Sec. 4. Factors to Consider.

".01. It is advisable to emphasize that in the valuation of the stock of closely held corporations or the stock of corporations where market quotations are either lacking or too scarce to be recognized, all available financial data, as well as all relevant factors affecting the fair market value, should be considered. The following factors, although not all-inclusive, are fundamental and require careful analysis in each case:

"(a) The nature of the business and the history of the enterprise, including the date of incorporation.

"(b) The economic outlook in general and the condition and outcome of the specific industry in particular.

"(c) The book value of the stock and the financial condition of the business.

"(d) The earning capacity of the company.

"(e) The dividend-paying capacity.

---

73. 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L. Ed. 150.

74. Appellant's brief, p. 33.

75. 1954, 348 U.S. 160, 168, 75 S.Ct. 186, 99 L.Ed. 202.

76. Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 1951, 190 F.2d 825, 829;

Gilbert v. Gulf Oil Corp., 4 Cir., 1949, 175 F.2d 705.

77. Gilbert v. Gulf Oil Corp., 4 Cir., 1949, 175 F.2d 705, 709.

78. Rev.Rul. 54–77, 1954–1 C.B. 187.

"(f) Goodwill.

"(g) Sales of the stock and the size of the block of stock to be valued.

"(h) The market price of stocks of corporations engaged in the same or a similar line of business which are listed on an exchange."

 While adherence to Section 4 standards is certainly commendatory it would be too exacting and unrealistic to hold as a matter of law the nonconsideration of all these elements precludes the proffering of an opinion. In areas concerning the value of property, real or personal, the sufficiency of acquaintance with facts concept should be liberally construed for the subject matter is not susceptible to measurement by mathematical formula. Especially is this true where unlisted stock holdings are involved. Once the proponent has elicited testimony indicating a factual basis for the opinion and that the determination was not the product of conjecture, a trial judge cannot be charged with an abuse of discretion. The weight and final appraisal accorded an expert's testimony tested by the means and extent of his information as developed on cross-examination is an issue to be resolved by the triers.[79]

 Witness Greenstein, testified that in arriving at his opinion he considered: prior sales;[80] valuation for estate tax purposes on November 7, 1948 of five shares placed at $510 per share;[81]

listings in the national stock summary for 1946, 1948 and 1950;[82] valuation accorded 200 shares by the auditor of the William Freihofer estate on March 24, 1950;[83] book value;[84] and capitalization of dividends over a five year period.[85] Under these circumstances the court is unable to conclude the trial judge erred in denominating witness Greenstein's opinion a matter for jury deliberation.

 It is next urged that the trial judge erred in admitting evidence concerning defendant's failure to file an Income Tax Return for 1946. Appellant contends that failure to file a return and tax evasion are not similar acts; therefore, proof of the former does not logically eliminate the possibility that the latter occurred innocently.

In United States v. Long this Circuit,[86] relying upon the Spies doctrine,[87] has unequivocally adopted appellant's position and if the immediate facts were the same as those reported in Long the contention would prevail. The two cases, however, are significantly distinguishable. Alker's 1947 return, the initial period encompassed by the indictment, contains a false declaration that he had filed in 1946.[88] No comparable misstatement is indicated in the Long report.[89]

There is a body of case law unrelated to the tax field which allows in evidence integral parts of the principal event (concomitant parts of the criminal act, Wigmore, 3d Ed. Vol. I, § 218, Vol. II, § 306) to more or less fill in the background

79. Montana Railway Co. v. Warren, 1890, 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681.

80. N.T. 721–722.

81. N.T. 725.

82. N.T. 725.

83. N.T. 725.

84. N.T. 745.

85. N.T. 772.

86. United States v. Long, 3 Cir., 1958, 257 F.2d 340.

87. Spies v. United States, 1943, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418.

88. The following questions and replies appear on appellant's 1947 return (G–1):
 "If you filed a return for a prior year, what was the latest year?
 "1946.
 "To which Collector's office was it sent?
 "Phila., Pa.
 "To which Collector's office did you pay amount claimed in item 8(B), above?
 "Phila., Pa."

89. Note 86, supra.

surrounding the transaction in question.[90] The proof is sanctioned irrespective of any relation to a subsidiary issue.[91]

The case at bar presents compelling reasons for the admission of such evidence for not only was the misstatement an integral component of a return composing a segment of the indictment but it is also relevant on an essential element of the crime of tax evasion, namely, willfulness. See People v. DePompeis, 1952, 410 Ill. 587, 102 N.E.2d 813.

 The law is well settled that prior and subsequent acts whether they portray criminality or not when substantially similar to the subject matter forming the basis of the indictment are probative to negate the inference that the crucial conduct was unintentional, innocent, inadvertent or the product of mistake.[92] In a return charging misstatements with respect to dividends, interest, professional and directors' fees, other contemporaneous false statements substantial in nature,[93] therefore become significantly probative of the declarant's state of mind especially when the mental element is a principal question in issue.

Thus while evidence of Alker's failure to file a return in 1946 would be improper to prove Alker willfully evaded the income tax, United States v. Long, supra, it would be admissible to show that Alker's statement in his 1947 return that he filed in 1946 was false. It is this falsity rather than Alker's failure to file a return in 1946 which is relevant upon the question of willfulness. This principle is not in conflict with the holding in the Long case,[94] nor is it irrelevant in that it attempts to prove Alker guilty of a crime for which he was not indicted.[95] Accordingly, the evidence was correctly received.[96]

## V

 Appellant's final assignment is directed to disposition of a motion for continuance prior to trial wherein said application was denied. Reversal in this area is only justified on a showing of patent abuse of discretion.[97]

The record discloses—

The indictment forming the basis of the present prosecution was returned on

**90.** See Carney v. United States, 6 Cir., 1935, 79 F.2d 821; United States v. Rubenstein, 2 Cir., 1945, 151 F.2d 915, 919; Lypp v. United States, 6 Cir., 1947, 159 F.2d 353; Schwartz v. United States, 9 Cir., 1947, 160 F.2d 718; United States v. Crowe, 7 Cir., 1951, 188 F.2d 209; Bantum v. State, 1952, 7 Terry, Del., 487, 85 A.2d 741; State v. Ward, 1935, 337 Mo. 425, 85 S.W.2d 1, and Marshall v. State, 1949, 227 Ind. 1, 83 N.E.2d 763.

**91.** The principle is set out precisely in Section 218 of Wigmore on Evidence, 3d Ed. Vol. I wherein the learned author states:
"§ 218. Res Gestae and Acts a part of the Issue; Inseparable Crimes. There is, however, an additional class of cases in which the misconduct of a defendant may be received, irrespective of any bearing on character, and yet not as evidential of one of the above matters (design, motive or the like), or as relevant to any particular subsidiary proposition. That class includes *other criminal acts which are an inseparable part of the whole deed.*"

**92.** McCormick on Evidence, pp. 328–331, 345; Wigmore on Evidence, 3d Ed., Vol. II, §§ 302, 305, 316, 321; 51 Harv.L.Rev. 988 (1938); United States v. Fawcett, 3 Cir., 1940, 115 F.2d 764, 768; U. S. v. Feldman, 2 Cir., 1943, 136 F.2d 394, 399; Wiess v. United States, 5 Cir., 1941, 122 F.2d 675.

**93.** It is quite obvious that a truthful answer to the inquiry would have subjected Alker's returns to close scrutiny.

**94.** Note 86, supra.

**95.** Wigmore on Evidence, 3d Ed. Vol. II, § 305.

**96.** Other courts presented with the precise issue have reached the same conclusion but without articulation or for other reasons. See United States v. Steele, D.C.W.D.Pa.1957, 148 F.Supp. 515; Harris v. United States, 5 Cir., 1957, 243 F.2d 74.

**97.** Avery v. State of Alabama, 1940, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377; Hardy v. United States, 1902, 186 U.S. 224, 22 S.Ct. 889, 46 L.Ed. 1137.

April 11, 1955 and the case was initially listed for trial on December 5, 1955. For reasons of health a continuance was granted and the trial was set for June 4, 1956. Appellant's counsel on May 29, 1956 six days prior to the scheduled commencement of proceedings petitioned Judge Van Dusen for a further continuance predicated on appellant's alleged physical infirmity and its concomitant mental and emotional anxiety. Opposition to the application was tendered by the Government. Extended testimony presented by lay and medical witnesses was heard by Judge Van Dusen.

The evidence elicited on behalf of appellant disclosed that he was 72 years old and had a history of rather serious maladies that necessitated hospitalization at intervals. During the week preceding the date set for trial he had experienced a fainting attack which confined him to bed. Evidence of compression fractures of two vertebrae was diagnosed, the cause at the time, although not precisely known, being restricted to osterporosis or cancer. At a subsequent date cancer as a causative factor was eliminated. Appellant's medical witnesses testified he was unable to withstand the rigors of a trial and the attendant efforts necessary in preparation.

The Government countered by demonstrating that appellant had engaged in the practice of law within a few weeks of the trial date. Evidence, uncontradicted, was introduced revealing that appellant had been to his office on several occasions during the week directly preceding the hearing before Judge Van Dusen. Extensive preparation at considerable cost had been undertaken by the Government in contemplation of the impending trial. Finally, Dr. T. Grier Miller, an eminent physician whose examination both appellant and appellee on one occasion had agreed would be acceptable and determinative,[98] testified that the accused was physically and mentally able to stand trial.

Against this background the petition was denied.

Trial commenced as scheduled on June 4, 1956. After the jury had been impaneled and the first witness sworn, the appellant voluntarily absented himself pursuant to Federal Rule of Criminal Procedure 43.[99] Counsel for appellant precisely stated that the term voluntary encompassed the conditions as existed at the execution of Judge Van Dusen's order denying the motion for continuance, thereby preserving the right to contest the ruling.

Further, counsel submitted that any change in appellant's state from that time which would render appellant's absence involuntary would be promptly brought to the court's attention. The trial judge during the Government's presentation was apprised of no changed circumstances in appellant's condition.[100]

98. Counsel for appellant at the hearing before Judge Van Dusen stated:
"Mr. McBride: * * *
"It is quite true that when Your Honor selected Dr. Grier Miller to examine Mr. Alker, I personally stated that I was absolutely satisfied that Your Honor had picked one of the very best men Your Honor could pick, and that I would abide by the results but in saying that I did not understand that whatever Dr. Miller said—that is, if his opinion was less than conclusive—we would assume it would be something that it was not."
(N.T. 6–7).

99. Diaz v. United States, 1912, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500; Parker v. United States, 4 Cir., 1950, 184 F.2d 488.

100. At the commencement of each session the following typical colloquy between court and counsel for appellant took place:
"The Court: I wanted to make the same record that we have been making, if I may. It is that the defendant is not personally present in court and that in accordance with the present state of the record, the absence is voluntary and that the trial will proceed; that is a correct statement?
"Bradley: Correct, yes sir, as we have used the word voluntary." (N.T. 429).

At the conclusion of the prosecution's case alternative motions were presented requesting (1) withdrawal of a juror, or (2) a continuance. The first motion was denied but a continuance lasting approximately two months was accorded. Immediately prior to the date set for reconvening additional motions were proffered premised on the same medical reasons. The motions were duly rejected.

Appellant's case graced by his attendance was thereafter presented to the triers. It is essential to note that appellant testified for a period encompassing three days. No ill effects from this display were apparent.

■ Under these circumstances the court deems that Judge Van Dusen's denial of appellant's motion was in all respects proper from both legal considerations and the realities.

■ The inordinate delay between the Government's case and the accused's presentment although not specifically urged as error has caused the court much concern. A continuance lasting two months in a criminal prosecution of a non-corporate defendant tried to a jury can hardly be termed commensurate with the minimal standards required for the efficient administration of justice. Under the particular circumstances appellant's acts having precipitated the unfavorable situation and there being no showing that appellant's rights were in any manner prejudiced, the disposition of this appeal will not be altered. An observation, however, is deemed appropriate.

■ Long delays in proceedings are unquestionably inimical to our system of justice and should not be contenanced save for compelling reasons. In instances where a short stay will not suffice the trial judge should (1) revoke the bail of the accused and force trial, or (2) grant a mistrial.

The judgment of the district court will be affirmed.