**STATE of North Dakota, Plaintiff and Appellee,**

v.

**David Everett HILLING, Defendant and Appellant.**

**Cr. No. 431.**

Supreme Court of North Dakota.

June 11, 1974.

Thomas F. Kelsch, State's Atty., Bismarck, for plaintiff and appellee.

Kent A. Higgins, Bismarck, for defendant and appellant.

VOGEL, Judge.

This is an appeal from a judgment entered on a jury verdict whereby the defendant-appellant, David Everett Hilling, was found guilty of the crime of delivery of a controlled substance, lysergic acid diethylamide (LSD), to an undercover agent for the North Dakota Bureau of Criminal Investigation (hereinafter "Crime Bureau"), a violation of Section 19.03.1–23(1)(b), North Dakota Century Code.

For conviction, the State relied principally upon the testimony of its agent, Gregory Eastburn, and his reports of events which he witnessed on August 17 and 18, 1971, the latter being the date of the alleged offense.

An abbreviated account of agent-reporting procedures utilized by the Crime Bureau is necessary to an understanding of the issues presented on appeal. According to Eastburn's testimony, at the end of each day's activities he would return to his apartment where he would dictate an account of that day's events into a tape recorder. When he had dictated several tapes he would arrange for their surreptitious transfer to the Crime Bureau Office, where they were transcribed by a secretary. These tapes and the transcriptions of them were called "daily reports."

Since each daily report may have contained the accounts of several activities concerning more than one suspect, and since the case against any one suspect may consist of events occurring over a period involving several daily reports, the undercover agent later referred to the "daily reports" in writing this "case report," a compilation of all activities concerning one suspect and one alleged criminal act. The transcripts of daily reports were thus even-

tually read and initialed by the agent, and were used by him to write a case report.

Prior to the preliminary hearing, held on March 2, 1972, the State provided counsel for the defendant with a copy of the case report, but not the daily reports. On April 5 the defendant filed a motion for disclosure of all favorable or exculpatory information, pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The defendant also filed a motion specifically asking production of copies of daily reports prepared by Eastburn on August 17 and 18, 1971. The court granted the *Brady* motion, but denied the motion for production of the daily reports on the basis, in part, that such motion was "premature."

There were serious discrepancies between the daily report and the case report, as the following parallel quotations show:

| Case Report | Daily Report |
| --- | --- |
| "On August 18, 1971, at 1400 hours, on the sandbar, I met a Bob Crotty, who was accompanied by one David Hilling of Bismarck. Bob Crotty, at that time introduced me to Hilling. At this time my exact words were to Dave Hilling, 'I understand you have some acid for sale.' Hilling assured me that this was correct and that he was selling it in lots of 100. At that time I told him that I was only interested in buying $25 worth. He then told me that he would have to talk to the other partners who he was dealing with and at this time, he instructed me to follow him to his home." | "On August 18, 1971, at 1400 hours, on the sandbar, I met a Bob Crotty who informed me that he had found a party who had some acid for sale and that he was selling it in lots of 100. However, at that time, I told him that I was only interested in $25 worth. He then told me that he would have to talk it over with his partners. At this time, he instructed me to follow him and he proceeded to a home. . . . We were met at the door by a Dave Hilling and at this time my exact words were to Dave Hilling, 'I understand that you have some acid for sale'." |

Eastburn's testimony was similar to the statements in the case report. It is obvious that the daily report is far less incriminating of Hilling, the defendant here, than the case report. The daily report makes no mention of Hilling until Eastburn is introduced to him at the Hilling home, after making preliminary arrangements for the

sale with Crotty, while the case report puts Hilling on the sandbar where the preliminary negotiations were made and makes him a participant in the negotiations.

The discrepancies between the two reports are considerable, and the defendant claims that through a combination of circumstances and rulings he was deprived of the opportunity to discover them prior to trial and the opportunity to cross-examine as to them at the trial.

Specifically, the defendant makes three claims:

First, that he was entitled to discovery of the daily reports as favorable or exculpatory information prior to trial;

Second, that he was deprived of his right to cross-examine as to the prior inconsistent statements of Eastburn contained in the daily reports; and

Third, that he was prejudiced by a testimony of Eastburn claiming that the daily reports were "stolen."

The defendant claims that all three of these errors are of constitutional dimensions.

The defendant might never have known of the discrepancy between the daily report and the case report if it were not for the fortuitous circumstance that the defendant's father had a close acquaintance who worked at the office of the State Bureau of Criminal Investigation, where the records of undercover agents were kept. Apparently, the employee noticed the discrepancies and made copies of the daily reports and furnished them to the father of the defendant, who ultimately placed them in the hands of the defense attorney. She went further and allowed the father, about a week before the trial, to "borrow" her keys to the office, with the consequence that the original records were stolen from the office prior to trial.

In preparation for trial, the defense attorney subpoenaed the Superintendent of the Bureau of Criminal Investigation and directed him to bring the original daily reports to court. By that time the originals were gone and the superintendent so reported when he responded to the subpoena on the opening day of trial.

## DEFENSE DISCOVERY OF FAVORABLE INFORMATION KNOWN TO PROSECUTION

In determining whether there was a duty to produce the daily reports and whether that duty was breached, dates become important. The original demand for production was made on April 5. The State's Attorney first learned that the daily reports had been stolen on May 6 and advised the defense attorney of that fact on May 8. The trial began on May 10. The theft took place sometime between April 27 and May 6.

As will appear, there was considerable confusion in the courtroom as to whether and when there is a duty of the prosecution to disclose information to the defense. At various times rulings were made on the basis of whether or not the document had been used to refresh recollection, whether it was in evidence, whether the witness had testified on the subject matter, and whether the exhibit was, in fact, contradictory to his testimony.

There are at least four rules, statutory or court-made, relating to the duty of the prosecution to produce documents for the defense.

■ One rule is the so-called *Brady* rule, articulated in Brady v. Maryland, *supra,* which requires production on demand of information known to the prosecution (including the police) favorable to the defendant and material to guilt or punishment. The rule of Brady v. Maryland has many antecedents including People v. Mooney, 178 Cal. 525, 174 P. 325, cert. den. 248 U.S. 579, 39 S.Ct. 21, 63 L.Ed. 430 (1918); Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406 (1935); Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); People v.

Savvides, 1 N.Y.2d 554, 154 N.Y.S.2d 885, 136 N.E.2d 853 (1956); and Brady v. State, 226 Md. 422, 174 A.2d 167 (1961).

This rule, incidentally, is referred to in the explanatory note to Rule 16, North Dakota Rules of Criminal Procedure, quoting *Brady, supra,* 373 U.S. at 87: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to the guilt or punishment, irrespective of the good faith or bad faith of the prosecution." The same explanatory note points out that the *Brady* rule "may require a production of statements of witnesses and potential witnesses at different times under different circumstances than are specified in [Rule 16]."

■ The duty to produce favorable or exculpatory materials under the *Brady* rule is not limited to materials in the hands of the prosecutor. It includes material known to the police. Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842 (CA4 1964). Other cases are collected in the annotation at 34 A.L.R.3d 16, Sec. 12(a).

■ We hasten to add that the prosecutors here had no knowledge of the discrepancy between the case report and the daily reports prior to trial. The good faith of the prosecutors, however, does not affect the applicability of the *Brady* rule. Brady v. United States, *supra.*

A prosecutor has a duty to inquire into and examine the contents of police files to discover exculpatory and favorable materials and to make timely disclosure of them to the defense, when a demand is made. This is particularly true when, as here, the documents demanded are clearly described.

An inquiry here of the investigative agency would have discovered the discrepant reports of Eastburn, and disclosure should have followed.

■ The *Brady* rule does not compel the prosecutor to completely open his files to the defense (although many prosecutors

do so, and the prosecutor here involved usually does so, we understand). The prosecutor need not disclose the investigation of false leads. Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

But evidence which tends to cast serious doubt on the credibility of prosecution witnesses must be disclosed. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) [witness testified falsely as to promise of lenient sentence]; Powell v. Wiman, 287 F.2d 275 (CA5 1961) [nondisclosure of witness's confession of other crimes, psychiatric treatment, and perjured testimony].

■ If Eastburn's original tapes had been destroyed after being fairly transcribed, we would have a different question. See United States v. Spatuzza, 331 F.2d 214 (CA7 1964), cert. den. 379 U.S. 829, 85 S.Ct. 58, 13 L.Ed.2d 38; United States v. Terrell, 474 F.2d 872 (CA2 1973).

■ A second rule is the so-called *Jencks* rule, articulated in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1967), later modified and put into statutory form as 18 U.S.C. Section 3500, commonly called the Jencks Act. This rule was modified and adopted in North Dakota as part of the North Dakota Rules of Criminal Procedure, in Rule 16 (h). This rule requires that "statements" (as defined in the rule) of witnesses be produced for the defense after a witness has testified on direct examination.

■ A third rule requires the production of specified documents by the prosecution when the defense has initiated the discovery proceedings permitted in Rule 16, Federal Rules of Criminal Procedure, as adopted in Rule 16(a) through (g), N.D. R.Crim.P.

A fourth rule requiring the production of documents is an older one, the rule permitting examination by the defense of documents used by a witness to refresh his

recollection. State v. Braathen, 77 N.D. 309, 43 N.W.2d 202 (1950).

It must be noticed that these four approaches to discovery of documents are separate, distinct, and not necessarily related in any way to each other.

■ While the second and fourth rules create a duty to produce documents only during a legal proceeding, the *Brady* rule and Rule 16 may compel discovery prior to the time when any witness testifies. The *Brady* rule, it must be emphasized, creates a duty of constitutional dimensions immediately upon the making of the demand, regardless of the stage of the proceedings at which the demand is made.

The timing of the production of favorable and expulpatory material must depend in part upon the need of the defense for time for trial preparation, and the recognition that the prosecutor has many other responsibilities. Here, we have the unusual circumstance that the original materials were stolen. We are unable to determine that the failure to produce the materials prior to the theft violated the rights of the defendant, although we are satisfied that failure to produce them at all, if there had been no theft, would have violated his rights.

## THE RIGHT OF CROSS-EXAMINATION

■ When Eastburn, the narcotics agent who made the daily report and the case report, was called as a witness by the State, the defense attorney in cross-examination attempted to use the conflict between statements in the daily report and the direct testimony as the basis for impeachment by prior inconsistent statements. He was met with a barrage of objections. They included the objection that the witness could not identify the document [he said that he couldn't do so without comparing it with the original], that the document was stolen and subject to confiscation as stolen property, that the cross-examination went beyond the scope of the direct examination, that the document had not been used to refresh the recollection of the witness, and that the defense could not use the copy of the daily report for cross-examination unless it was first received in evidence. Several of these objections were sustained by the court. All should have been overruled. The right to cross-examine as to prior inconsistent statements has nothing whatever to do with the rules of evidence as to refreshment of recollection by a memorandum, nor with the *Brady* rule we have discussed above, nor the *Jencks* rule likewise discussed above. A prior inconsistent statement may be written, as in State v. Nagel, 75 N.D. 495, 28 N.W.2d 665 (1947), or oral, as in State v. Hanson, 73 N.W.2d 135 (N.D.1955). There is no requirement that the prior inconsistent statement, if written, be in evidence at the time the questions as to the prior inconsistent statement are asked. State v. Nagel, *supra*. Even hearsay may be admissible as an impeaching statement. State v. Columbus Hall Association, 75 N. D. 275, 27 N.W.2d 664 (1947). In holding that these extraneous rules of evidence or production of documents had something to do with the right of the defense to inquire as to prior inconsistent statements, the court erred.

The consequence of sustaining the objections was that the defense attorney was unable to cross-examine Eastburn as to his prior inconsistent statements during the cross-examination of the witness.

The defense attorney attempted to defuse the effect of these rulings: (1) by asking leave to withdraw the witness and lay a foundation for the daily report through other witnesses, (2) by asking the court to call the witness as a court witness and thereby permit cross-examination by both sides, and (3) asking leave to ask the impeaching questions without reference to the daily report. All of these requests were denied. At least one should have been granted, so as to cure the prior erroneous rulings and to allow appropriate

cross-examination at the proper time during the trial.

Still the defense attorney did not desist in his attempts to cross-examine, as most attorneys would have done by this time. He waited until the opening of the defense case, and then called two witnesses, former employees of the State Bureau of Criminal Investigation (one of whom was the friend of the defendant's father), to lay the foundation for introduction in evidence of the copy of the daily report. It was ultimately received in evidence. He then asked leave to recall Eastburn for further cross-examination, but was allowed to call him only as a defense witness. When he attempted to interrogate Eastburn on the prior inconsistent statements contained in the daily report, he was met with the objection that he could not impeach his own witness, and the objection was sustained.

■ In all of this, the court committed multiple reversible errors of constitutional magnitude in depriving the defense of its right to cross-examine, by requiring introduction of the impeaching statement into evidence as a preliminary to the attempted impeachment; by requiring the defense to call the agent as its own witness; and by refusing to allow the defense to impeach him by prior inconsistent statements.

■ The right to cross-examine is a constitutional right. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed. 2d 297 (1973).

The right is absolute and the denial of the right as to material evidence is prejudicial error requiring a new trial. Knoepfle v. Suko, 108 N.W.2d 456 (N.D.1961).

"The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.' [Citations omitted.] It is, indeed, 'an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.'"

Chambers v. Mississippi, *supra,* 410 U.S., at 295.

The right of confrontation guaranteed by the Sixth Amendment to the United States Constitution means more than being allowed to confront the witness physically. "Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination." Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965), quoted in Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Denial of the right of effective cross-examination is "constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." Davis v. Alaska, *supra.*

■ The trial court does have a right to inquire as to whether the cross-examiner has a reasonable basis for asking the questions as to prior inconsistent statements. Such an inquiry may be made in chambers, but it should be directed to the ascertainment of a reasonable basis for the attempt to impeach, not to the admissibility of a document containing the statement. The court could have inquired, in chambers, of the defense attorney whether he had a factual basis for the aspersions cast by the questioning as to discrepancies between the daily reports on the one hand and the case reports and the testimony of the agent on the other hand. The proper procedure for determining the factual basis for cross-examination by inquiry out of the presence of the jury is outlined in Goodman v. United States, 273 F.2d 853 (CA8 1960), and United States v. Alker, 260 F.2d 135 (CA3 1958). The purpose of such an inquiry is to make sure that the cross-examiner is "not merely taking a random shot at a reputation imprudently exposed or asking a groundless question to waft an unwarranted innuendo into the jury box." Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

■ Here, the court erred in requiring the defense to call an obviously hostile and adverse witness as its own in order to cross-examine him as to prior inconsistent statements. This was error, where the witness was plainly hostile and unwilling and was the chief witness against the defendant. While North Dakota has recognized the "voucher rule" that one is presumed to vouch for the truthfulness of his own witness [George v. Triplett, 5 N.D. 50, 63 N.W. 891 (1895)] we have permitted cross-examination of one's own witnesses in case of surprise [George v. Triplett, *supra*], and contradiction of one's own witnesses by other witnesses [Jacobson v. Mutual Benefit H. & A. Association, 70 N.D. 566, 296 N.W. 545 (1941)], as well as the calling of a witness as a court witness, thereby permitting cross-examination by both sides. See Hefty v. Aldrich, 220 N.W.2d 840 (N.D. 1974). The "voucher rule" will be rejected entirely if the newly proposed Federal Rules of Evidence are adopted. See Rule 607. It should be. Wigmore calls it "a primitive notion, resting on no reason whatever, but upon mere tradition . . . ." IIIA Wigmore on Evidence, Chadbourn Edition, Sec. 898.

The true extent of the "voucher rule" is probably simply that the party calling a witness is likely to be held responsible for the testimony of that witness in the eyes of the judge or jury, and jury arguments to that effect can be made, but the rule should never be used to prevent cross-examination of a witness who is adverse or hostile or one whom a party is required to call by the necessities of the case.

■ The State here contends that the defendant was not prejudiced because the document in question, the daily report, was ultimately received in evidence and the defense attorney used the inconsistencies between it and the case report in his final argument. This is true, but by that time the trial was a shambles. Approximately two days had been spent in wrangling over irrelevancies and extraneous objections, both in and out of the presence of the jury. The trial tactics of both sides, and the defense in particular were in disarray. Most serious of all, the defense attorney was never able to cross-examine the principal State witness in any pointed and direct way. He was never able to put to the State's witness the series of questions designed to point out unmistakably to the jury his contention that the witness either lied when he made the daily report or that he lied on the witness stand and in the case report.

The right to cross-examine is more than a right to introduce conflicting documents —it is the right to confront a witness face to face and test his veracity and his accuracy by probing questions which compel direct answers. That right of the defendant was denied him. He was thereby deprived of what Wigmore called the "greatest legal engine ever invented for the discovery of truth." 5 Wigmore on Evidence, 3d Ed., Sec. 1367.

We should always be alert to encroachments upon the right to a fair trial. It can be lost by erosion as well as by avulsion.

■ In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court ruled "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." We adopt that standard, and since we are unable to declare that the multiple errors in this case were harmless beyond a reasonable doubt, we reverse the conviction and remand for a new trial.

## THE EFFECT OF THE STATEMENT THAT THE REPORTS WERE STOLEN

■ The defendant's third claim of error relates to a statement by Eastburn, while under interrogation by the State's Attorney, that the daily reports "have been stolen from the State Crime Bureau." The answer was given in response to a question asking why Eastburn had not consulted his daily reports before testifying.

The defense asserts that the prejudicial effect of the answer is at least equivalent to the prejudice which resulted under somewhat similar circumstances in State v. Schlittenhardt, 147 N.W.2d 118 (N.D. 1966). In that case the statement was made that a witness had identified the defendant by locating his picture in a book entitled "Known Criminals." There, as here, the answer, or at least the prejudicial language contained in it, was volunteered by the witness and not called for directly by the question. In *Schlittenhardt* this court held that the error was so prejudicial that even an admonition to the jury to disregard it could not cure the prejudice.

If the answer given by Eastburn had contained a direct statement or inference that the theft had been committed by the defendant, we would have a nearly exact parallel with the *Schlittenhardt* case, but the mere statement that the papers were "stolen" does not directly imply that they were stolen by the defendant. On the other hand, in some respects that effect of the statement here might be expected to be more prejudicial than in *Schlittenhardt,* since the court did not even admonish the jury to disregard the statement that the papers were stolen, and the statement might be considered less excusable than in *Schlittenhardt,* since the defense attorney had alerted the State to the danger by asking for a protective order forbidding reference to the theft of the reports.

Although we believe it would have been preferable to instruct the jury to disregard the statement and draw no inferences adverse to the defendant from the statement, we do not hold that the error was prejudicial. The case must be tried anew and the problem should not arise again.

Reversed and remanded for a new trial.

PAULSON, J., concurs.

ERICKSTAD, Chief Justice (concurring in the result).

I concur in the result, for the reason that I am not convinced that the Brady Rule applies in this case. I do not concur in that part of the syllabus which may be construed to hold that the Brady Rule applies.

TEIGEN, Judge (dissenting).

I dissent.

Hilling was charged and convicted of the crime of delivery of a controlled substance. No claim is made that the evidence was not sufficient to prove beyond a reasonable doubt that Hilling did deliver the controlled substance to the undercover agent. Furthermore, a review of the evidence discloses proof of delivery beyond a reasonable doubt. Delivery thereof did not take place at the sandbar but at the home to which the undercover agent was taken. The majority point out that the discrepancy between the case report and the daily report pertains to "preliminary negotiations" for the delivery at the sandbar. The purpose of the introduction of the daily report into evidence was to show the jury that the undercover agent had lied, thus attacking his credibility. This objective was accomplished when the copy of the daily report was received in evidence during the presentation of the defense case in chief, on stipulation that it was a true and accurate copy of the original. Further, Hilling's attorney was permitted to argue and, in fact, did argue at length on this matter to the jury. The jury was perfectly cognizant that the two reports differed and that the undercover agent's testimony differed from his daily report. Therefore the objective of the defendant to impeach was accomplished. Much credit must be given to counsel for Hilling in his persistence and, although his efforts were long and arduous, he succeeded in accomplishing his objective. For these reasons it appears to me that, even assuming the series of errors referred to by the majority all relate to the introduction into evidence of the written daily report, they were, for the reasons stated, harmless and not prejudicial to the defendant. It is more likely that the State's case was damaged because

the defendant prevailed in his effort to impeach.

The United States Supreme Court held in Killian v. United States, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961), rehearing denied, 368 U.S. 979, 82 S.Ct. 476, 7 L.Ed.2d 441 (1962), and in Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959), that the harmless-error rule applies to situations within the Jencks Act, and circumstances may show that there was only harmless error and that the error may also be cured by subsequent actions of the trial court. I believe that the same rule applies here. It is clear to me that, in this case, if error there was, it was cured and no prejudice to the defendant's case has been shown. I believe that the harmless-error rule should have been applied and the judgment of conviction affirmed.

KNUDSON, J., concurs.