STATE of North Dakota, Plaintiff and Appellee,

v.

Robert CARMODY, Defendant and Appellant.

Crim. No. 573.

Supreme Court of North Dakota.

April 25, 1977.

Burt L. Riskedahl, Bismarck, for appellant.

Robert E. Manly, State's Atty., New Rockford, for appellee.

PEDERSON, Justice.

Robert Carmody (hereinafter Carmody), his brother Michael, Eldon Hanson and Philip Sharbono spent several hours together on August 14, 1973, consuming alcoholic beverages in several bars in Carrington. When the bars closed at one o'clock the next morning, the four men got into a car owned by Michael and proceeded at a high rate of speed out of Carrington, pursued by Carrington police officers. At a point near the city of New Rockford, the car swerved out of control and overturned. Eldon Hanson died at 2 a. m., August 15, 1973, as a result of injuries received.

Carmody was arrested and charged with first degree manslaughter, trial was had to a jury and, on December 7, 1973, he was convicted of second degree manslaughter.

On an application to this Court for post-conviction relief, we remanded for resentencing—*State v. Carmody*, 243 N.W.2d 348 (N.D.1976). At the resentencing hearing, Carmody moved for a new trial. The motion was denied and he was resentenced. This is an appeal from the judgment and from the denial of the motion for a new trial.

The issues are stated by Carmody as follows:

(1) "Whether the prosecution's eliciting testimony from the appellant on cross examination and commenting, in the presence of the jury, regarding appellant's failure to testify and deny his involvement at the preliminary hearing, violated the appellant's statutory and constitutional rights";

(2) "Whether in-custody-statements made by the appellant were voluntarily given and not subject to *Miranda* requirements"; and

(3) "Whether, in the case of vehicle deaths, the enactment of North Dakota Century Code 12–27–35 (negligent homicide) in 1957 repealed by implication North Dakota Century Code 12–27–17(1) (manslaughter first degree) with which the appellant was charged and North Dakota Century Code 12–27–19 (manslaughter second degree) with which the appellant was convicted."

## PRETRIAL SILENCE

The first issue involves questions asked by the prosecuting attorney when cross-examining Carmody, who took the witness stand voluntarily in his own behalf. The first question asked by the prosecutor, who had not participated in the preliminary hearing, was whether Carmody had taken the stand at the hearing. With no objection from his counsel, Carmody replied, "I was never asked to." The prosecutor then asked whether Carmody knew, at the time of the preliminary hearing, that if Eldon

Hanson was the driver there would be no further case. The trial court overruled defense counsel's objection and, at defense counsel's suggestion, the question was reworded as follows: "At the time of the preliminary hearing did you know and understand that if it was established' that Eldon Hanson was the driver of the automobile there would be no further case?"

Carmody's reply was that he did not understand that, after which defense counsel again objected on the ground that the question called for a legal conclusion, and again the court overruled the objection.

On this appeal it is argued that the statements of the prosecutor and the inferences from the questioning conveyed to the jury an impression that Carmody was under a duty to testify at the preliminary hearing.

It has been held that a defendant in a criminal case who takes the witness stand in his own behalf is subject to the same rules of cross-examination as those that govern other witnesses. *State v. Kent*, 5 N.D. 516, 67 N.W. 1052, 35 L.R.A. 518 (1896) (also known as *State v. Pancoast*). See also, *State v. Hanson*, 73 N.W.2d 135, 139 (N.D.1955), where we said:

"A defendant cannot be compelled to testify. But when he voluntarily does so, he waives his constitutional privilege of not being required to give evidence tending to incriminate him, to impeach him, and he may be asked questions as to other offenses the same as any other witness. *State v. Kent, supra.* Where an accused voluntarily takes the witness stand in his own behalf, he waives his constitutional privilege of not answering proper questions that may tend to convict him of the crime for which he is on trial and he subjects himself to the same rules that govern other witnesses as to cross-examination and impeachment. When he voluntarily offers testimony upon any fact, the same constitutes a waiver as to all other relevant facts because of the necessary connection between them all."

The United States Supreme Court, in *Raffel v. United States,* 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), held that:

"The safeguards against self-incrimination are for the benefit of those who do not wish to become witnesses in their own behalf and not for those who do."

*Raffel* was subsequently limited by *Stewart v. United States,* 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961), in which the United States Supreme Court held that comment upon defendant's failure to testify at a previous proceeding was proper only when the prior silence was inconsistent with subsequent exculpatory statements in a later proceeding. Such prior silence could be elicited for impeachment purposes, the court held, when it constituted an admission.

The view that silence after arrest at a previous proceeding could constitute an admission after the court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), seems incongruous, and whatever remaining vitality *Raffel* retained appears to have been substantially diminished by *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In that case the prosecutor's cross-examination of the defendants concerning their failure to make exculpatory statements at the time of their arrest was held to violate due process. In deciding the constitutional question expressly left open by its decision in *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), the court discussed post-arrest silence in light of *Miranda* in these terms:

"Despite the importance of cross-examination, we have concluded that the *Miranda* decision compels rejection of the State's position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, see *Michigan v. Tucker*, 417 U.S. 433, 443–444, 94 S.Ct. 2357, 2363–2364, 41 L.Ed.2d 182 (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the

wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. \* \* \*

"We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle v. Ohio,* 96 S.Ct. 2244, 2245, *supra.*

We think *Doyle* is particularly applicable to the instant case in which Carmody chose not to testify at the preliminary hearing. The decision often rests upon the sound advice of counsel, and nothing should be ascribed to Carmody's decision to accept that advice and remain silent. To do so in this instance was constitutional error.

■ However, not every constitutional violation requires automatic reversal of a conviction. *Doyle* clearly indicated the applicability of the standard enunciated in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), when it stated:

"The State has not claimed that such use in the circumstances of this case might have been harmless error." *Doyle v. Ohio,* 96 S.Ct. 2245, *supra.*

*Chapman* declined to rule that all federal constitutional errors require automatic reversal, and instead placed a heavy burden upon the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. The comments to the North Dakota harmless error rule, Rule 52, NDRCrimP, adopt the *Chapman* test that before a "federal constitutional error may be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

In *State v. Bragg,* 221 N.W.2d 793, 801 (N.D.1974), (a case in which the defendant did not voluntarily take the stand) we stated that the defendant's statement to the effect that his knowledge of a burglary was none of the investigating officer's business was an invocation by the defendant of his Fifth Amendment privilege of remaining

silent as to the particular interrogatory posed. In that opinion, we quoted with approval from a Michigan court of appeals decision in *People v. Severance,* 43 Mich. App. 394, 204 N.W.2d 357, 359 (1972), in which that court commented upon the prosecution's use of the defendant's previous silence in these terms:

"Admission of such testimony is reversible error unless we can say that it is harmless error under the ruling in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), reh. den. 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967)."

The *Chapman* harmless error standard has been applied in two recent federal court decisions which have decided the issue of the prosecutor's comment (when defendants have voluntarily taken the stand) upon the defendant's previous silence in light of *Doyle.* In *Booton v. Hanauer,* 541 F.2d 296 (1st Cir. 1976), the court found that it was constitutional error to introduce evidence of a refusal to answer questions but, after examining the circumstances and finding "the absence of any kind of aggravating circumstances which have led to reversals of convictions in other cases", held that the error was harmless. In *United States v. Harp,* 536 F.2d 601 (5th Cir. 1976), the court, after making a similar analysis of the circumstances, concluded that "because the prosecutor's comments struck at the jugular of their [defendants'] story, those remarks cannot be classified as harmless." Compare also the divided opinion by the Wisconsin Supreme Court, *Reichhoff v. State,* 76 Wis.2d 375, 251 N.W.2d 470 (1977).

Returning to our instant case, which was tried when *Raffel, supra,* still retained most of its vitality, the questions that were asked and the responses given by Carmody left no obvious inferences of a duty of a defendant to testify at his preliminary hearing. Significantly, there was no objection voiced when the question was asked as to whether he had testified. Objection was raised to the question relating to Carmody's understanding that *if it were established that* Hanson had been the driver of the automo-

bile, the case against him would be ended. We are not persuaded that, by inference, this must be construed as a prejudicial comment concerning Carmody's pretrial silence. We know of no argument to the jury by the prosecutor, in this case, urging the jury to infer guilt from the silence. Carmody did not move for a mistrial. In the light of other substantial evidence of guilt, including admissions properly admitted, we are convinced that the constitutional error which occurred when the questions relating to pretrial silence were asked did not affect the substantial rights of Carmody. We believe that the constitutional error was harmless beyond a reasonable doubt. Under the standards prescribed in *Chapman* and under Rule 52(a), NDRCrimP, it was harmless error.

Mr. Justice Frankfurter, concurring in *Johnson v. United States,* 318 U.S. 189, 202, 63 S.Ct. 549, 87 L.Ed. 704 (1943), wrote:

"In reviewing criminal cases, it is particularly important for appellate courts to re-live the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal appeal into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution."

We are particularly impressed in this case with the numerous occasions upon which Carmody testified, including his responses to questions from his own counsel, to facts wholly inconsistent with his claim that he was not the driver. He readily admitted several times that, on the night in question, he acknowledged that, because he had declined to submit to a chemical analysis of his blood, he knew that his driver's license would be revoked for six months. Under Chapter 39–20, NDCC, commonly known as the implied consent law, only drivers, not passengers, lose their licenses for refusing to submit to the test.

### IN–CUSTODY STATEMENTS

Carmody argues that the record does not indicate that he was "properly warned of his *Miranda* rights prior to the giving of any statement." He does not point out where he was thereby prejudiced but only urges the Court to read the record in "totality" when considering the significance of the question.

We have read the entire record and find that the absence of a full *Miranda* warning before "any statements" were received was caused by Carmody himself. At the scene of the accident the officer informed Carmody that he was under arrest and that he would be charged with "aggravated reckless driving and DWI." Carmody stated, at that time, that he was not the driver of the automobile. There were several attempts by the officer at that time to read to Carmody the complete statement of *Miranda* rights. Each attempt was interrupted by Carmody, insisting that he understood his rights. We find no evidence, at this stage, of any questioning in a coercive atmosphere and no statements made by Carmody which were, in any way, prejudicial to his cause. The activities of the officers at the scene were directed, principally, to the attending of the injured. Carmody, handcuffed, was left seated alone in the patrol car during that period.

Carmody was subsequently taken to the New Rockford hospital waiting room, or lobby, while the officer checked on the welfare of Eldon Hanson. It was then learned that Hanson had died and when Carmody was told about the death, he exclaimed, "My God!" According to the officer's testimony, Carmody stated, without being asked, that he had been the driver. After this exclamation, the complete *Miranda* warning was given but there was no questioning. Again, as the officers were taking Carmody, along with his brother, from the hospital for incarceration at Carrington, Carmody asked why they were taking his brother—"I was driving the car." There was no objection made to the testimony of the arresting officer concerning Carmody's statements upon learning of the death of Hanson and the statements made upon leaving the hospital.

Carmody states that his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct.

1602, 16 L.Ed.2d 694 (1966), were violated when his admissions were introduced. We disagree. *Miranda, supra,* holds that the privilege against self-incrimination guarantees to the individual the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." 384 U.S. 460, 86 S.Ct. 1620.

As was stated in *Michigan v. Mosley,* 423 U.S. 96, 99–100, 96 S.Ct. 321, 324, 46 L.Ed.2d 313 (1975):

"In the *Miranda* case this Court promulgated a set of safeguards to protect the there delineated constitutional rights of persons subjected to custodial police interrogation. In sum, the Court held in that case that unless law enforcement officers give certain specified warnings before questioning a person in custody, [footnote omitted] and follow certain specified procedures during the course of any subsequent interrogation, any statement made by the person in custody cannot *over his objection* be admitted in evidence against him as a defendant at trial, even though the statement may in fact be wholly voluntary." [Emphasis added.]

Applying these principles to this case we find that the first admission by Carmody, when he learned of Hanson's death, was voluntary and there was no objection made when the evidence was introduced. The second admission, when he was concerned that his brother was also to be incarcerated, was voluntary, was made after a full *Miranda* warning had been given, and was not objected to when introduced into evidence.

## NEGLIGENT HOMICIDE—MANSLAUGHTER

Relying on *State v. Hagge,* 224 N.W.2d 560, 565 (N.D.1974), Carmody argues that he is entitled to a new trial on a charge of negligent homicide pursuant to § 12–27–35, NDCC (subsequently superseded by § 12.1–16–03, NDCC). In *Hagge* we said:

"The two statutes, § 12–27–17, N.D.C.C., and § 12–27–35, N.D.C.C., are so irreconcilably in conflict and repugnant that the purpose of the enactment of the two statutes cannot be harmonized."

Accordingly, we, in that case, set aside the verdict of guilty of manslaughter in the first degree and remanded for new trial on the charge of negligent homicide. Second degree manslaughter, defined in § 12–27–19, NDCC, was not involved in *Hagge.*

The *Hagge* opinion was filed on December 20, 1974, over a year after Carmody was charged with manslaughter in the first degree (§ 12–27–17, NDCC) on August 15, 1973, and over a year after he was convicted of manslaughter in the second degree (§ 12–27–19, NDCC) on December 7, 1973. No objection was made by Carmody to the charge until proceedings for post-conviction relief under Chapter 29–32, NDCC, were instituted in December 1975.

Rule 12(b), NDRCrimP, requires that defenses and objections based upon (1) defects in the institution of prosecution, and (2) defects in the indictment, information or complaint other than that it fails to show jurisdiction in the court or to charge an offense, must be raised prior to trial or they are waived. See Rule 12(f), NDRCrimP.

A complaint charging first degree manslaughter, evaluated as of August 15, 1973 (pre-*Hagge*), on its face was appropriate under the statute (§ 12–27–17, NDCC). That statute had not been declared superseded by any court.

The complaint clearly showed jurisdiction in the district court, where Carmody was charged and tried.

It is true that in syllabus 3 of *State v. Hagge,* 224 N.W.2d 562, *supra,* we said that:

"3. By enactment of the negligent homicide statute, the legislature removed homicide in the operation of motor vehicles from the purview of the earlier manslaughter statute and placed it within the purview of the negligent homicide statute and repealed the manslaughter statute to the extent that it included within its purview homicide resulting from improper operation of motor vehicles."

The reference therein to the words "manslaughter statute," and as used throughout the opinion, referred to manslaughter first

degree under § 12–27–17, NDCC, and not to manslaughter second degree under § 12–27–19, NDCC.

In *Hagge* we concluded that §§ 12–27–35 and 12–27–17, NDCC, were irreconcilable and that therefore the rules applicable to repeals by implication required the conclusion that § 12–27–17 was repealed insofar as it related to charges arising out of death by the operation of a motor vehicle.

■ Applying the same rules as we applied in *State v. Hagge, supra,* when we compare the charge of negligent homicide under §§ 12–27–35, 12–27–36 and 12–27–37, NDCC, with the charge of manslaughter second degree under §§ 12–27–19 and 12–27–20, NDCC, we find that they are totally reconcilable and consistent.

The principal element of the offense of negligent homicide is the driving of a vehicle in "reckless disregard of the safety of others."

The principal element of the offense of manslaughter second degree is "culpable negligence" which was defined in the case of *State v. Tjaden,* 69 N.W.2d 272, 282 (N.D.1955):

"* * * blamable and wanton lack of care evidenced in a reckless indifference to the safety and rights of others."

And, in *State v. Gulke,* 76 N.D. 653, 38 N.W.2d 722, 723 (1949), this Court held:

"The term culpable negligence as used in Section 12–2719, RCND 1943, defining manslaughter in the second degree as applied to the operation of a motor vehicle, implies a total lack of care which is properly described as being in a reckless and heedless manner with utter disregard for the lives and limbs of persons upon the highway."

The penalties under each of the offenses of negligent homicide and manslaughter second degree are identical, to wit, imprisonment in the penitentiary for not less than one year nor for more than five years, or in the county jail for not more than one year, or by a fine of not more than $1,000, or both such fine and imprisonment. In addition, under § 39–06–31(1), NDCC, a convic-

tion under either charge results in the revocation of a driver's license.

We conclude that negligent homicide and second degree manslaughter (when accomplished with the use of a motor vehicle) are completely consistent and reconcilable, and the enactment of the negligent homicide statute (§ 12–27–35, NDCC) did not supersede and repeal by implication the provisions of the second degree manslaughter statute (§ 12–27–19, NDCC). Carmody was thus not prejudiced when he was convicted under the manslaughter statute rather than the negligent homicide statute. There was no obvious or plain error under Rule 52(b), NDRCrimP It would not promote the ends of justice to grant a retrial of this case.

We accordingly affirm the judgment of conviction and the order denying the motion for a new trial.

ERICKSTAD, C. J., and PAULSON and SAND, JJ., concur.

VOGEL, Justice, dissenting.

The majority opinion admits that error of constitutional dimensions occurred when the prosecuting attorney inquired of the defendant as to whether he had testified at the preliminary hearing and why he had not done so, but says the error is harmless. I dissent.

Under the rule of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–711 (1967),

". . . before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

We have specifically approved this rule for North Dakota. *State v. Hilling,* 219 N.W.2d 164 (N.D.1974). We have gone farther: We have held that we are committed to fair trials, even where the evidence is ample for conviction. *State v. Jensen,* 251 N.W.2d 182 (N.D.1977); *State v. Haakenson,* 213 N.W.2d 394 (N.D.1974); *State v. Ghylin,* 222 N.W.2d 864 (N.D.1973); *State v. Schlittenhardt,* 147 N.W.2d 118 (N.D.1966).

In North Dakota we have a statute which specifically forbids prosecutors from doing what was done in this case. Section 29–21–11, N.D.C.C., says:

"In the trial of a criminal action or proceeding before any court or magistrate of this state, whether prosecuted by information, indictment, complaint, or otherwise, the defendant, at his own request and not otherwise, shall be deemed a competent witness, but his neglect or refusal to testify shall not create or raise any presumption of guilt against him. Nor shall such neglect or refusal be referred to by any attorney prosecuting the case, or considered by the court or jury before whom the trial takes place."

The majority opinion holds, in the face of all of this decisional, constitutional, and statutory law, that it was harmless error to allow the prosecuting attorney, over objection, to interrogate the defendant as to his failure to testify at the preliminary hearing. In order to do so, the majority has to find beyond a reasonable doubt that the error was harmless. *Chapman v. California, supra.*

It is my feeling, beyond a reasonable doubt, that the error was harmful. Anyone with any experience in prosecuting or defending criminal cases must know that the sort of inference created by the prosecutor's questions, leading the jury to believe that the defendant had a duty to tell his story at the earliest opportunity, will be nothing but devastating to any defense he may interpose. The defendant was asked whether he took part in the preliminary hearing, whether he took the witness stand, and whether he knew that if someone else was driving there would be no further case against him. His attorney objected, pointing out that it was the attorney's decision to not allow the defendant to testify at the preliminary hearing, that whether or not he testified had nothing to do with the trial, and that it was improper cross-examination. The attorney pointed out that the State needed "little more than nothing to bind a defendant to this Court, and I think to imply that if he had gone up and testified

that day that he was not driving, to imply that if he had done that we wouldn't be here today, I think that is highly irregular and it is not proper questioning, your Honor." All of the objections were overruled. The effect could only be devastating, and it is simply preposterous to hold that the error was harmless beyond a reasonable doubt.

In *State v. Bragg*, 221 N.W.2d 793 (N.D. 1974), we held that it was plain error to permit the State witness to testify to the effect that the defendant had remained silent after being arrested for a crime, even though the evidence was brought out without any objection whatever on the part of the defendant.

The majority opinion apparently attempts to escape this holding by attempting to distinguish *Bragg* on two grounds: (1) that Bragg did not take the witness stand at the trial, and (2) that somehow he lost his right to refuse to testify at the preliminary hearing by testifying at the trial.

The right to remain silent is absolute and is not dependent upon when it is invoked. Furthermore, in *Bragg* we cited two Michigan cases, *People v. Bobo*, 390 Mich. 355, 212 N.W.2d 190 (1973), and *People v. Severance*, 43 Mich.App. 394, 204 N.W.2d 357 (1972). In both of those cases the defendant did take the witness stand at the trial, and in both of them it was held that the prosecution may not use at the trial the fact that a defendant exercised his privilege of silence in the face of accusation. The reason was that the defendant would thereby be penalized for exercising the privilege. The same is true here, whether the defendant testified at the preliminary hearing or not.

It is no answer to the constitutional error to say that a defendant can be cross-examined like any other witness. Of course he can, but he does not lose his constitutional rights by taking the witness stand. One of those rights is that he has a right to remain silent, at trial as well as before trial. This is a right that other witnesses do not have, unless they claim their Fifth Amendment privilege and sustain it. When the majority opinion admits that

". . . whatever remaining vitality *Raffel* retained appears to have been substantially diminished by *Doyle v. Ohio,* . . ."

the majority admits that there remains no persuasive authority whatever for the proposition that a defendant's refusal to testify can be commented upon by the prosecution.

In *Chapman, supra,* the question before the court was whether questions and comments of a prosecutor referring to the defendant's failure to testify could ever be harmless error. The United States Supreme Court held that they could be harmless error, but were not in that case. The whole burden of *Chapman v. California* is that error of constitutional dimensions is presumed reversible error, that the existence of constitutional error puts a burden on the beneficiary of the error to prove that there was no injury, and that before such error can be held harmless the court must be able to declare a belief that it was harmless beyond a reasonable doubt. Under that rule, I submit that the error in the present case is flagrantly reversible. The exact language of the United States Supreme Court is:

"Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in *Fahy v. Connecticut* [375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171] about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California, supra,* 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710.

Most of the cases on the right of the defendant to remain silent relate to situations such as that in *Bragg, supra,* where the defendant does not immediately assert his innocence to the police. Even in such cases, comment on his silence is almost always reversible error. See *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *State v. Bragg, supra.* The reason is well stated in *United States v. Hale,* 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99, 107 (1975):

"Not only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice. The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted. And permitting the defendant to explain the reasons for his silence is unlikely to overcome the strong negative inference that the jury is likely to draw from the fact that the defendant remained silent at the time of his arrest.

"As we have stated before: 'When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out.' *Shepard v. United States,* 290 U.S. 96, 104, 54 S.Ct. 22, 26, 78 L.Ed. 196 (1930). We now conclude that the respondent's silence during police interrogation lacked significant probative value and that any reference to his silence under such circumstances carried with it an intolerably prejudicial impact."

Comments on failure to testify are even more flagrantly prejudicial when the comment relates to failure to testify at a preliminary hearing. This is admitted by the minority justices of the United States Supreme Court in *Doyle v. Ohio, supra,* where they say:

". . . a more difficult question is presented by their objection to the questioning about their failure to testify at the preliminary hearing and their failure generally to mention the 'frame' before trial. Unlike the failure to make the kind of spontaneous comment that discovery of a 'frame' would be expected to

prompt, there is no significant inconsistency between petitioners' trial testimony and their adherence to counsel's advice not to take the stand at the preliminary hearing; moreover, the decision not to divulge their defense prior to trial is probably attributable to counsel rather than to petitioners." 426 U.S. at 630–632, 96 S.Ct. at 2250, 49 L.Ed.2d at 104.

Also pertinent is footnote 10 of the dissent:

"Under Ohio law, the preliminary hearing determines only whether the defendant should be held for trial. The prosecution need establish, at most, that a crime has been committed and that there is 'probable and reasonable cause' to hold the defendant for trial and the court need only find 'substantial credible evidence' of the charge against the defendant. . . . Defense counsel thus will have no incentive to divulge the defendant's case at the preliminary hearing if the prosecution has presented substantial evidence of guilt. Since that was the case here, no significant impeaching inference may be drawn from petitioners' silence at that proceeding." 426 U.S. at 632, 96 S.Ct. at 2251, 49 L.Ed.2d at 105.

All of these things may properly be said of the case before us. Indeed, the objections by defense counsel quoted above show that the failure of the defendant to testify at the preliminary hearing was due entirely to the advice of the attorney. Therefore, "no significant impeaching inference may be drawn" from the defendant's silence at the preliminary hearing.

Since the United States Supreme Court has held, in *Doyle,* that it is constitutional error requiring reversal to refer to the silence of the defendant when accused by the police, and since even the four dissenting justices in the same case concede that silence at a preliminary hearing raises "a more difficult question" and that silence upon recommendation of the defense attorney means that "no significant impeaching inference may be drawn from" the silence, it seems to me simply irrefutable that reference to silence at the preliminary hearing is reversible constitutional error.

Let us now examine the evidence which the majority relies upon to prove beyond a reasonable doubt that the constitutional error was harmless.

The statements by the defendant which the majority considers as incriminating are disputed. Several peace officers testified that the defendant, his brother, and the surviving passenger refused to say who was driving, and that later, after the other passenger died, the defendant admitted being the driver. The defendant denied this, and so did his brother. The surviving passenger, when called as a defense witness, appeared to be too intoxicated to testify. The defendant said that he was arrested, handcuffed, and then questioned as to whether he was the driver. Somewhat indignantly, he asked the officers why he was arrested if they didn't know who was driving and, when his brother was arrested, apparently for having a gun, why they were arresting him if the defendant was the driver, and he admitted making a statement such as, ". . . it looks like they are going to try to hold me for driving."

As for the statement that he knew he would lose his license for refusing to take a blood test, which the majority construes to be an admission that he was driving, there is not one iota of evidence that the defendant knew that only drivers could be compelled to take the test or that only drivers could lose licenses for being under the influence of liquor. In fact, the evidence is that the Assistant State's Attorney told him that "by refusing he would lose his driver's license," from which the defendant could fairly conclude that anyone who refuses to take the test will lose his license whether he was driving or not.

To me, it is nowhere near proved beyond a reasonable doubt that the defendant was guilty. There was enough evidence to go to a jury, but the jury found the defendant guilty of a lesser crime than that charged. The jury may very well have been influenced by evidence totally inadmissible and totally improper—evidence that the defend-

ant had exercised, under the advice of his attorney, the right to remain silent at a preliminary hearing. That right is being destroyed by court decisions such as that of the majority.

Even if it is conceded that there was a preponderance of the evidence in favor of conviction, and even if we assume [although *United States v. Harp,* 536 F.2d 601 (5th Cir. 1976), says otherwise] that it still is possible to find harmless error in prosecutorial comments on post-*Miranda* silence, it would be necessary to find that not one juror could have had a reasonable doubt of guilt in order to hold the error harmless [*Minor v. Black,* 527 F.2d 1 (6th Cir. 1975)]. I can't do it.

The effect of opinions such as the majority opinion in this case is to allow prosecuting attorneys to commit error of constitutional dimensions with impunity. If they have a strong case, they may violate the Constitution in the secure knowledge that the appellate court will hold that the evidence of guilt was so strong that the error was "harmless." If they have a weak case, they may violate the constitutional rights of the defendant in the hope that the error will be overlooked, or in the belief that they have nothing to lose since the case will be lost, anyway.

I would adhere to our rulings listed in the second paragraph of this dissent, and in *State v. Bragg, supra,* and I would follow the United States courts in their rulings in *United States v. Hale, supra, Doyle v. Ohio, supra,* and *United States v. Harp, supra,* and would therefore reverse.